**Minna SCHONDORF, Plaintiff,**

v.

**SMA LIFE ASSURANCE COMPANY, Defendant.**

**No. CV-87-2961 (ADS).**

United States District Court, E.D. New York.

Sept. 5, 1990.

Mark Landesman, P.C., New York City (Chana Sklar Israel, of counsel), for plaintiff.

Townley & Updike, New York City (Richard R. Lutz, Matthew C. Mason, of counsel), for defendant.

MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

By way of the defendant's motion for summary judgment, the Court is asked to

determine whether certain undisputed misrepresentations made by the insured in his application for life insurance are "material" as a matter of law, thus voiding the resulting contract of insurance. Since at least some of the misrepresentations are "material" as a matter of law in that they induced the insurer to accept an application for a policy of insurance which it might otherwise not have accepted, the Court grants the defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56(b).

## FACTUAL BACKGROUND

The material facts of this action are undisputed, except where otherwise indicated, and are summarized below as follows.

On March 14, 1985, Laser Schondorf ("Insured"), filed a written application for a life insurance policy in the amount of $100,000 with the defendant SMA Life Assurance Company ("SMA"). On March 18, 1985, Dr. R.S. Salisbury examined the Insured, and asked him to answer the questions contained in Part II of the application. In completing Part II of the application, the Insured stated that all statements were "complete, true and correctly recorded." The Insured made the following responses (indicated in brackets), to the questions contained in Part II concerning the Insured's past medical and family history:

3. a. Name of personal physician: [Dr. Irving Chitman].

b. Address [1225 48th Street, Brooklyn, New York].

c. Date and reason last consulted? [3/84. Cold].

4. When did you last consult any physician?

a. Name

b. Address [# 3 Above].

c. Reason

5. During the past ten years have you ever had, been told you had, or been treated for:

a. Chest pain, angina, heart attack, heart murmur, high blood pressure, rheumatic fever, or any other disorder of the heart or blood vessels? [No].

 * * * * * *

e. Peptic ulcer, recurring indigestion, vomiting of blood, bloody stools, colitis, hepatitis, cirrhosis, jaundice, or other disorder of the stomach, intestine, liver, gall bladder or pancreas? [No].

f. Sugar, albumin, blood or pus in urine; nephritis, venereal disease; stone or other disorder of kidney, bladder, prostate, or reproductive organs? [No].

 * * * * * *

k. Hernia, varicose veins, hemorrhoids, rectal disorder? [Yes].

 * * * * * *

6. During the past five years have you:

a. Had a checkup, illness, injury, or surgery? [Yes].

b. Been a patient or outpatient in a hospital or other medical facility? [Yes].

c. Had electrocardiogram, x-ray, or other diagnostic tests? [Yes].

d. Had a periodic health examination? [No].

7. Are you now under treatment, observation, or taking any medication? [No].

8. During the past ten years have you:

a. Been advised to have a test or surgery which was not done? [No].

b. Been treated or received counselling for alcohol or drug use? [No].

c. Requested or received benefits, or payment because of an injury, sickness, or disability? [No].

d. Changed occupation or residence because of health? [No].

e. Had insurance declined, rated or modified? [No].

 * * * * * *

10. Do you engage in a scheduled exercise program? (If 'Yes', give details-type, duration, frequency) [No].

 * * * * * *

13. Has any member of your family ever had high blood pressure, heart disease, diabetes, cancer or mental illness? If 'Yes', give details. [No].

| 14. Family Record | Age If Living | State of Health or Cause of Death | Age at Death |
|---|---|---|---|
| Father | | [Killed] | [61] |
| Mother | | [W.W. II] | [60] |
| Brothers | [0] | | |
| and Sisters | [0] | | |

Based upon the statements contained in the application, on March 14, 1985,[1] SMA issued a life insurance policy with a "standard rating" for a 68–year old male with no significant medical history ("the Policy"). The plaintiff, Minna Schondorf, is the named beneficiary under the Policy.

Five months after the issuance of the Policy, the Insured died of a heart attack on August 12, 1985, which is within the two-year contestability period contained in the policy (*see* N.Y.Ins.Law § 3203[a][3]). After his death, SMA undertook "a standard contestable investigation" of the Insured's past medical history, including interviews with physicians and a review of medical records. Gleaned from this investigation was personal and family medical history concededly not disclosed in the application submitted to SMA.

The investigation disclosed that in 1983 the Insured had in fact been examined and treated by Dr. Bernard Wechsler, a cardiologist. The Insured had complained to Dr. Wechsler of chest pain and pressure lasting for hours (*see* question 5[a]), and was prescribed Corgard, Nitrobid and Nitroglycerine for the pain (*see* question 7). He also reported to Dr. Wechsler that he had been prescribed and was taking Corgard and Inderal (*see* question 7), drugs typically prescribed for persons suffering from angina pectoris and/or high blood pressure. The Insured was also ordered to undergo a "Holter 24–hour electrocardiogram", during which he twice complained of chest pain (*see* question 5[a]).

Immediately following the Insured's death, Dr. Wechsler provided a statement to SMA on December 5, 1985, which stated that he believed the Insured had angina pectoris when he was first treated by Dr. Wechsler in 1983. Although this was his stated opinion shortly after the Insured's death (*see* Wechsler statement dated December 5, 1985), it appears, however, that at the time of this motion Dr. Wechsler takes a different view (*see* Wechsler Aff't dated March 25, 1990).

The Insured was also examined and treated by Dr. Baroukh Kodsi for rectal bleeding on February 13, 1985 (*see* question 5[e]). Dr. Kodsi's records indicate that the Insured reported to him that he had a history of angina pectoris (*see* question 5[a]), and took Corgard once daily (*see* question 7). Dr. Kodsi recommended further testing of the rectal bleeding (*see* question 5[e]), but the Insured died before any were undertaken.

The Insured's history and/or symptoms of angina was also reported to Dr. Friedman (*see* question 5[a]), who performed a hernia operation on the Insured in November, 1983. The hernia operation was disclosed in response to question 5(k) of the application.

Additionally, the Insured's family medical history, as reported to Dr. Kodsi, indicated that in fact his mother died of diabetes, and that his father died at age 58 of a heart attack (*see* questions 13, 14). Apparently, he also had siblings who suffered from high blood pressure (*see* questions 13, 14).

Based upon the foregoing, SMA concluded that misrepresentations appear in the responses to questions 3, 4, 5(a), 5(e), 5(f), 5(k), 7, 13 and 14. As a result, SMA refused to pay on the policy, which prompted Minna Schondorf to institute this action to recover the proceeds. SMA contends that because the Insured failed to truthfully disclose his past medical and family history, he was required to submit only to a routine medical exam. According to SMA, its underwriting manual provides that any applicants with a possible history or symptoms of angina pectoris or chest pain, must submit to a medical exam, lab analysis of urine, chest X-rays, blood studies, and a possible EKG.

SMA contends that these past visits to Dr. Wechsler, along with the drugs prescribed and statements made to other phy-

---

1. The insurance became effective from the date Part I was completed (*i.e.*, March 14, 1985), subject to the terms of a temporary insurance agreement.

sicians, all indicate a history of chest pain and possibly angina, which, if revealed in the application, would have at least resulted in additional testing for the Insured. Although SMA concedes that it is not sure of what type of policy, if any, would have been issued had the Insured undergone such additional testing, it alleges that these misrepresentations seriously interfered with its right to accept or reject the application.

Based on the foregoing facts, pursuant to Fed.R.Civ.P. 56(b), SMA moves for summary judgment on the ground that the insured made material misrepresentations in his application for insurance and that had the true facts been disclosed, the application might have been rejected.

## DISCUSSION

Summary judgment is appropriate if there are no genuine issues of material fact (Fed.R.Civ.P. 56[c]). Although on a motion for summary judgment the Court is required to view the evidence submitted in the light most favorable to the non-movant (*see Burtnieks v. The City of New York*, 716 F.2d 982, 985 [2d Cir.1983]), the non-moving party has the burden to come forward with facts showing that a genuine issue for trial exists (*see National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 203 [2d Cir.1989]). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 [1986]). The Court's function, of course, is "issue finding", not "issue resolution" (*see Eye Assocs., P.C. v. IncomRx Sys. Ltd.*, 912 F.2d 23, 27 [2d Cir.1990] (citations omitted)).

Under New York law, which governs this diversity action, any "material misrepresentation" in an insurance application voids the resulting policy (*see* N.Y.Ins.Law § 3105[b]). A "misrepresentation" is a false "statement as to past or present fact, made to the insurer ... at or before the making of the insurance contract as an inducement to the making thereof" (N.Y.

Ins.Law § 3105[a]), which may take the form of either false affirmative statement or a failure to disclose (*see generally* B. Ostrager & T. Newman, *Handbook on Insurance Coverage Disputes* § 3.01[b], at p. 59 [3d ed. 1990] [citing cases]).

A misrepresentation is deemed "material", if "knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make such contract" (N.Y.Ins.Law § 3105[b]). " '[E]ven an innocent misrepresentation ... if material, is sufficient to allow the insurer to avoid the contract of insurance or defeat recovery thereunder'" (*Mutual Benefit Life Ins. Co. v. JMR Elecs. Corp.*, 848 F.2d 30, 32 [2d Cir.1988], *quoting Process Plants Corp. v. Beneficial Nat'l Life Ins. Co.*, 53 A.D.2d 214, 216, 385 N.Y.S.2d 308, 310 [1st Dep't 1976], *aff'd mem.*, 42 N.Y.2d 928, 366 N.E.2d 1361, 397 N.Y.S.2d 1007 [1977]; *see also Vella v. Equitable Life Assurance Soc'y*, 887 F.2d 388, 391 [2d Cir.1989] ["[s]o long as a misrepresentation is material, it is no defense to an action for rescission that the misrepresentation was innocently made"]). The test, " 'is not whether the company *might have issued* the policy even if the information had been furnished; the question in each case is whether the company has been induced to accept an application which it *might otherwise have refused*'" (*id.*, *quoting Geer v. Union Mutual Life Ins. Co.*, 273 N.Y. 261, 269, 7 N.E.2d 125, 128 [1937] [emphasis in original in *Geer*]).

As to whether summary judgment is appropriate under such circumstances, "[t]he materiality determination normally presents an issue of fact for the jury, but 'where the evidence concerning the materiality is clear and substantially uncontradicted, the matter is one of law for the court to determine'" (*Mutual Benefit v. JMR Elecs.*, *supra*, 848 F.2d at p. 32, *quoting Process Plants Corp. v. Beneficial*, *supra*, 53 A.D.2d at p. 216, 385 N.Y.S.2d at pp. 310–11; *see also Kulka v. William Penn Life Ins. Co.*, No. 88 Civ. 3377 (RJW), slip op. at n. 3 [S.D.N.Y. Apr. 5, 1990] [LEXIS, Genfed library, Dist file] [citing cases]; *accord Zachary Trading Inc. v.*

*Northwestern Mutual Life Ins. Co.*, 668 F.Supp. 343, 346–47 [S.D.N.Y.1987] ). As stated above, the Court, of course, may only grant summary judgment in the absence of any genuine issues of material fact (*see* Fed.R.Civ.P. 56[c]; *see also Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 [2d Cir.1986] ).

In *Cohen v. Mutual Benefit Life Ins.*, 638 F.Supp. 695, 697 (E.D.N.Y.1986), which is a case factually similar to this, Judge Bartels noted that,

> "[a] determination of materiality as a matter of law may be based on evidence of the insurer's practice with respect to similar risks, as shown by such documents as the insurer's underwriting manuals or rules, and by testimony of a qualified employee of the insurer that the insurer would not have issued the particular contract it did had the facts been disclosed."

If a misrepresentation is "material", summary judgment in favor of the insurer is both available and appropriate, and has been frequently awarded based on a variety of medical history misrepresentations contained in the application for insurance (*see, e.g., Mutual Benefit v. JMR Elecs., supra*, 848 F.2d at p. 34 [failure to disclose smoking history]; *Cohen v. Mutual Benefit, supra*, 638 F.Supp. at p. 699 [failure to disclose heart trouble in application where insured died of cardio-respiratory arrest four months after policy issued]; *Friedman v. Prudential Life Ins. Co.*, 589 F.Supp. 1017, 1026 [S.D.N.Y.1984] [citing cases] [history of heart disease]; *Shabashev v. New York Life Ins. Co.*, 150 A.D.2d 673, 673, 541 N.Y.S.2d 545, 546, [2d Dep't 1989] [heart condition and prior hospitalization]; *Borchardt v. New York Life Ins. Co.*, 102 A.D.2d 465, 465–70, 477 N.Y.S.2d 167, 168–70 [1st Dep't] [hypertension, diabetes], *aff'd*, 63 N.Y.2d 1000, 473 N.E.2d 262, 483 N.Y.S.2d 1012 [1984]; *Ehrlich v. Mutual Life Ins. Co.*, 52 A.D.2d 836, 836, 382 N.Y.S.2d 828, 829 [2d Dep't 1976] [existence of chest pains, as well as blood thinning medication] ).

There is no dispute here that there were misrepresentations made in the form of omissions by the Insured in the application submitted to SMA. At oral argument, counsel for the plaintiff conceded that the sole issue presented is whether these misrepresentations are deemed "material" as a matter of law. Although SMA contends that there were misrepresentations as to questions 3, 4, 5(a), 5(e), 5(f), 5(k), 7, 13 and 14, the record indicates, and the Court finds, that genuine issues of material fact exist as to the accuracy or inaccuracy of responses 3, 5(f) and 5(k). Therefore, only the materiality of the misrepresentations contained in the responses to questions 4, 5(a), 5(e), 7, 13 and 14 will be considered by the Court on this *motion for summary judgment.* In sum, the Court must determine whether the insurer, SMA, was induced to accept an application which it might otherwise have refused had the Insured truthfully and accurately disclosed his personal and family medical history as requested.

In support of its motion, SMA submitted two affidavits from Alan Boyer, Vice President and Senior Underwriter of SMA, as well as relevant portions of SMA's underwriting manual, which set forth the applicable rules or guidelines to consider in insuring applicants with certain medical conditions or symptoms.

In opposition, the plaintiff submitted affidavits from Minna Schondorf, the beneficiary, Murray Rosen, an independent insurance underwriter and former professor of insurance law, and Dr. Bernard Wechsler, cardiologist. Of course, the Court is mindful that "[i]n determining whether an expert opinion is sufficient to withstand a summary judgment motion, courts undertake a detailed inquiry into the admissibility of the proffered testimony" (*In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1239 [E.D.N.Y. 1985], *aff'd*, 818 F.2d 187 [2d Cir.1987], *cert. denied sub nom. Lombardi v. Dow Chem. Co.*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 [1988] ).

Essentially, the plaintiff claims that SMA *could have* obtained the information regarding the Insured's visits to Dr. Wechsler had SMA investigated the records of

Dr. Friedman and Dr. Chitman, the two doctors that were disclosed in the application. In addition, the plaintiff alleges that there was never any specific determination or finding by any physician that the Insured in fact was suffering from or diagnosed as having angina pectoris. Finally, the plaintiff contends that under SMA's underwriting procedures, the same policy would have been issued even if the questions had been correctly answered. The plaintiff's three contentions, however, are without merit.

■ As to an alleged duty on the part of SMA to undertake a more extensive investigation prior to issuing the policy, the "duty to disclose" clearly rests with the *insured* (*see* 12A J. Appleman & J. Appleman, *Insurance Law and Practice* § 7292 [1981]), not the insurer. The insured is required to reveal " 'every fact bearing on or pertaining in any way to the insurability of [his] life, especially where specific questions are put to the applicant calling for such information' " (*Cohen v. Mutual Benefit*, *supra*, 638 F.Supp. at p. 698, *quoting Klapholtz v. New York Life Ins. Co.*, 218 App.Div. 695, 699, 219 N.Y.S. 64, 67 [1st Dep't 1926]). "An insured cannot remain silent while cognizant that his insurance application contains misleading or incorrect information" (*North Atlantic Life Ins. Co. v. Katz*, App.Div., 557 N.Y.S.2d 150, 152 [2d Dep't 1990]).

The plaintiff does not contend that the questions on the SMA application are ambiguous. In any event, it could not be seriously argued that the questions posed to the Insured in the SMA application are ambiguous or confusing. The Court finds as a matter of law that the questions are unambiguous since they request specific information, in some cases merely "yes"/"no" responses, to very straightforward inquiries. Under these circumstances, the duty rests with the insured to furnish truthful, accurate and complete responses in order to allow the insurer to adequately evaluate any risks revealed.

■ The plaintiff's argument that there was never a specific determination that the Insured suffered from angina pectoris is similarly unavailing. Even though there was never a specific determination that the Insured actually suffered from angina, if the application was truthfully completed, SMA may have rejected the application or perhaps issued a differently rated contract of insurance based on its applicable stated underwriting considerations. In either event, the misrepresentations are deemed "material" as a matter of law (*see* N.Y. Ins.Law § 3105[b]). It is irrelevant whether or not the Insured was *actually* suffering from heart disease or angina pectoris (*see Ettman v. Equitable Life Assurance Soc'y*, 6 A.D.2d 697, 697–98, 174 N.Y.S.2d 553, 554–55 [2d Dep't 1958], *aff'd*, 5 N.Y.2d 1005, 158 N.E.2d 124, 185 N.Y.S.2d 262 [1959]). Rather, the focus is whether the misrepresentations "seriously interfere[d] with the exercise of the insurance company's right to accept or reject the application" (*Process Plants Corp. v. Beneficial National Life Ins.*, 53 A.D.2d 214, 216, 385 N.Y.S.2d 308, 311 [1st Dep't 1976], *aff'd*, 42 N.Y.2d 928, 366 N.E.2d 1361, 397 N.Y.S.2d 1007 [1977]). It matters not that the plaintiff now attempts to offer evidence that the Insured perhaps was not suffering from or diagnosed as having angina pectoris. What does matter, however, is the inaccuracy of the responses to the questions, and the fact that had they been truthfully answered, SMA might have rejected the application. Accordingly, to the extent that the plaintiff relies on the argument that no determination of angina was ever made, in this Court's view it is irrelevant to this determination and does not create any genuine issues of material fact.

Finally, with respect to the plaintiff's argument that the same policy would have been issued applying SMA's underwriting policies, this too must be rejected.

In support of its motion, SMA submitted excerpts from its underwriter's manual, which show that had the Insured's application been accurately and truthfully completed, at the very least SMA would have required the Insured to undergo additional testing before issuing a policy. SMA concedes that although it may have issued

*some* policy, it may not have issued *the* policy that it did.

In particular, as to angina pectoris, the underwriter's manual provides in relevant part:

### 10.2.1. Underwriting Criteria—The Basic Rating.

Risks should not be considered until a minimum of six months has passed since onset of first angina symptoms.

The Basic Rating is applicable after recovery from one or more episodes of stable angina pectoris or coronary insufficiency providing there is no increase in frequency or severity symptoms. Rate from date of last symptoms.

| | |
|---|---|
| Stable angina pectoris or coronary insufficiency, no arteriography. ECG normal or minimal changes | Apply Basic Rating Class I |
| Arteriography normal, no significant obstruction | Apply Basic Rating Class I and reduce flat extra by $5 |
| Arteriography abnormal | Apply Basic Rating Class I to III according to findings |
| ECG more than minimal changes, but stable | Minimal Class II |
| Current exercise ECG normal | Apply appropriate Basic Rating and reduce flat extra by $5 |
| Unstable angina pectoris, symptoms increasing in severity, frequency or duration | Decline |
| Pre-infarction syndrome, crescendo angina, angina decubitus | Decline |
| Prinzmetal's variant angina or coronary spasm | Apply Basic Rating and reduce flat extra by $5 |

Aside from the above guidelines, section 10.2.2 of the underwriter's manual provides certain adjustments to the basic rating, based on the following factors:

### 10.2.2. Adjustments to Basic Rating.

| | |
|---|---|
| 1. Under age 35 at time episode | Apply Basic Rating Class II and add 100 |
| 2. Current ECG reflecting unstable pattern, significant ST elevation or depression, left ventricular hypertrophy, multifocal premature contractions, paroxysmal tachycardias, atrial flutter or fibrillation, 3rd degree AV block | Refer to M.D. Usually decline |
| 3. More than moderate impairment of left ventricular function | Decline |
| 4. Arteriography indicating more than 50% reduction in diameter of left main coronary artery | Decline |
| 5. Extended disability following episode (more than 6 months) | Add 50 up |
| 6. Inadequate or infrequent follow-up care since recovery—lack of full confirmation of cardiac status from attending physician | Apply Basic Rating next higher Class to decline |
| 7. Ratable overweight, hypertension, blood lipids or adult onset diabetes | Add appropriate impairment ratings |
| 8. Current cigarette smoking | Apply Basic Rating minimal Class II |
| 9. Participation in hazardous occupation of [sic] avocation | Usually decline |

The Insured's medical records obtained during the course of SMA's contestability investigation disclose that he was in fact evidencing manifestations of angina pectoris. Significantly and concededly these were not disclosed in the application. Accordingly, SMA having no hint of these symptoms, issued a standard rated policy. Had the history of angina been disclosed, SMA undoubtedly would have undertaken an additional investigation in accordance with the underwriting policies in order to ascertain the stage or full extent of angina, if any. Then and only then, could it have properly determined the risk involved in issuing the appropriately rated policy.

 Additionally, apart from angina pectoris, according to the underwriting manual if the insured discloses "any other chest pain" not clearly diagnosed as to cause, or lacks definite symptoms, "but sufficiently suspicious to cause concern about possible cardiac involvement, [the manual states that this] requires careful work-up". The "careful work-up," includes the following:

a. Chest Pain Questionnaire should be secured from applicant and attending physician.

b. If an electrocardiogram and x-ray have been made by the attending physician, they should be submitted to the Medical Director for his evaluation.

c. If the diagnostic problem is difficult, a current satisfactory electrocardiogram and chest x-ray will help obtain the best offer.

d. An exercise electrocardiogram will be even more helpful and should be secured if the amount is large.

The frequency and duration of the pain, its location and character, its association

with dyspnea or with sighing respiration, the type of medication used, the loss of time from work, the family history, variations from normal in the electrocardiograms, and borderline weight or blood pressure must all be given serious consideration individually and in their interrelated aspects.

| | No ECG | Normal ECG |
|---|---|---|
| Within 1 year | 100 up | 50 up |
| 2nd and 3rd years | 75 up | 50 to 0 |
| 4th year on | 50 to 0 | 0 |

If, "on careful review," the type of chest pain is deemed "indeterminable as to cause and not suggestive of cardiac origin," then the policy may be issued standard (Underwriting Manual 10.5[B]).

Again, had the Insured disclosed his history of chest pain, additional steps may have been taken by SMA to determine the underwriting risk.

At the very least, had the Insured truthfully disclosed his history of chest pain and symptoms of angina pectoris (question 5[a]), according to SMA's underwriting manual, the Insured would have been required to complete a "Chest Pain Questionnaire", which inquires in detail about the history, circumstances and treatment of the chest pain. In addition, a current electrocardiogram and chest x-ray may have been demanded, as well as an "exercise electrocardiogram". In this regard, the Court notes that there is evidence that the Insured was on heart medication starting at least in 1983 and he was on the same medication in February of 1985, one month prior to this application. This was never reported to SMA (see question 7). In sum, the Insured's non-disclosure of this basic and significant personal medical history in response to unambiguous questions put to him, certainly bears on which underwriting guidelines become applicable and therefore deprived SMA of a meaningful opportunity to properly evaluate a potential and dangerous risk.

The Court also finds that the Insured's misrepresentations as to his family history (see questions 13, 14), are "material" as a matter of law. In this regard, the underwriting manual provides that "[w]here there are deaths in the reported family history due to cerebral or cardiovascular-renal disease under age 60, underwrite cautiously with attention to all risk factors" (Underwriting Manual 7.13). On the application, the Insured represented that his mother and father were killed in World War II at ages 60 and 61, respectively. However, according to Dr. Kodsi's records, the Insured reported to him that both parents died at age 58; his mother of diabetes, father of "heart trouble". The plaintiff has not refuted these facts. Given this family history, at the very least SMA would have proceeded with greater caution and may have even required additional testing.

Based upon the above, the Court finds that the misrepresentations contained in the response to questions 4, 5(a), 5(e), 7, 13 and 14 are "material" as a matter of law. SMA's underwriting manual provides that additional testing and information would have been called for if these questions had been answered truthfully. Perhaps the additional testing may have resulted in the issuance of the same standard rated policy. However, these misrepresentations seriously interfered with and deprived SMA of its absolute right to properly evaluate the true risk involved. Based on this record, with reasonable insurance underwriting certainty, it is entirely possible, if not probable, that the results of the additional testing might have required rating of the policy or a total declination of the application. Since the Insured's misrepresentations here " 'seriously interfere[d] with the exercise of the insurance company's right to accept or reject the application' " (Cohen v. Mutual Benefit, supra, 638 F.Supp. at p. 699), they are deemed "material", and the resulting contract is considered void ab initio (see INA Underwriters Ins. Co. v. D.H. Forde & Co., 630 F.Supp. 76, 77 [W.D.N.Y. 1985] [citing New York cases]).

Accordingly, the Court finds that based upon SMA's underwriting policies, had the Insured accurately answered questions 4, 5(a), 5(e), 7, 13 and 14, the application for insurance may have been rejected, or if accepted, a different rated policy may have been issued. In any event, there is no

doubt that the nondisclosure interfered with SMA's assessment of the risk.

Since the Court finds that SMA's evidence of materiality as to the answers to the above questions "is clear and substantially uncontradicted", the determination therefore becomes purely a question of law for the Court to decide (*see Mutual Benefit v. JMR Elecs., supra*, 848 F.2d at p. 32).

Although the Court finds that there were "material misrepresentations" contained in the application as stated above, the Court rejects SMA's contentions that there were also material misrepresentations as a matter of law as to questions 3 ("name of personal physician"), 5(f) ("sugar, albumin, blood or pus in urine ..."), 5(k) ("rectal disorder"), and that portion of question 5(a) calling for a response as to a history of "high blood pressure." The Court finds that SMA has not produced "clear and uncontradicted" evidence with regard to the answers to those questions. Accordingly, the Court grants summary judgment to SMA because of the materiality of the misrepresentations contained in questions 4, 5(a), 5(e), 7, 13 and 14.

## CONCLUSION

For the foregoing reasons, pursuant to Fed.R.Civ.P. 56(b), the defendant SMA Life Assurance Company's motion for summary judgment is granted and the complaint is dismissed.

SO ORDERED.