**CERTAIN UNDERWRITERS AT LLOYDS, LONDON Who Are Members of Lloyd's Syndicated Numbered 658, 483, 741, 687, 79, 872, 535, 552, 123, 114, 741, 209, 1023, 309, 872 and 500, et al.**

v.

**ORYX ENERGY COMPANY.**

**Civil Action No. G–96–306.**

United States District Court,
S.D. Texas,
Galveston Division.

Feb. 21, 1997.

---

**149.** *See* docket entry nos. 3 and 9.

James Richard Watkins, Royston Rayzor Vickery & Williams, Galveston, TX, Bradley A. Jackson, Edward D. Vickery, Royston Rayzor, Vickery & Williams, Houston, TX, for plaintiffs Certain Underwriters at Lloyd's, London, Indemnity Marine Assurance Co., Ltd., Zurich Re (UK), Ltd., Ocean Marine Insurance Co. Ltd., Commercial Union Assurance, Tokio Marine & Fire, Phoenix Assurance P.L.C., LSA, Northern Assurance Company Limited, Gan Minster Insurance Co., Ltd., Terra Nova Insurance Company Ltd., Phoenix Assurance Public Ltd., Cornhill Insurance P.L.C., Yorkshire Insurance Co., Ltd., Skandia Marine Insurance Company (UK), Scottish Lion Insurance Co., Ltd., Hansa Re & Marine Insurance Company (UK) Limited, Threadneedle Insurance Co., Ltd., Sphere Drake Insurance, Dai–Tokyo Insurance Co., Compagnie D'Assurancey Martimes, Aeriennes & Terrestres (CA-MAT), Americas Insurance Company, Hansa Re–Marine, Anglo American Insurance Company, Gan France, Phoenix, Terra Nova, Camat, Cornhill D. A/C, Skandia Marine, Indemnity Marine, Yorkshire L. A/C, Zurich Re, Ocean Marine, Phoenix LSA A/C, Northern Marine, London & Edinburgh, Gan Min-

ster, Gernerali, Sphere Drake No. 1, Scottish Lion.

Jim E. Cowles, B. Michael Bennett, Cowles and Thompson, Dallas, TX, for defendant Oryx Energy Company.

## ORDER GRANTING SUMMARY JUDGMENT

KENT, District Judge.

Now before the Court are Plaintiffs' Motion for Summary Judgment, dated September 4, 1996, and Defendant's Cross–Motion for Summary Judgment, dated September 27, 1996. For the reasons set forth below, Plaintiffs' Motion is **GRANTED** and Defendant's Motion is **DENIED**.

### I. FACTUAL BACKGROUND

This case arises out of the serious personal injuries sustained by Henry Mote, an oil field worker, while employed by Mallard Bay Drilling on Oryx's fixed platform located on the Outer Continental Shelf offshore Texas. Mr. Mote filed suit against Oryx and other defendants to recover for his injuries which resulted in his becoming a paraplegic.[1] Mote settled this underlying action for $12,000,000, of which amount the Plaintiff Underwriters funded $11,050,000 on behalf of Oryx.

At the time of Mr. Mote's accident, Oryx and Mallard had a written agreement (the Drilling Agreement) under which Mallard was performing certain oil well drilling operations on Oryx's fixed platform located on the Outer Continental Shelf offshore Texas. The Drilling Agreement, which was written entirely by Oryx, provided that Mallard would defend and indemnify Oryx for injuries to Mallard employees. The Drilling Agreement also required Mallard to provide certain insurance coverages and to make Oryx an "additional insured for all coverages to the extent of the indemnity provided by" Mallard under the Drilling Agreement. *See* Plaintiffs' Ex. 1, p. 38. Mallard obtained the required insurance coverages from the Plaintiff Underwriters in Policy No. SP93–3096.

---

1. Mote could not sue Mallard as the Longshore & Harbor Workers' Compensation Act, 33 U.S.C. § 901, *et seq.*, was his exclusive remedy against his employer.

In response to Mr. Mote's lawsuit, Oryx requested Mallard to defend and indemnify Oryx for its liability to Mr. Mote as provided in the Drilling Agreement. Mallard agreed to defend and indemnify Oryx and appointed independent trial counsel, Robert J. Killeen, to defend Oryx. Mr. Killeen reported Mallard's agreement to defend and indemnify Oryx and Mallard's appointment of counsel to the Underwriters.

During the pendency of the Mote litigation, Oryx's separate insurance counsel, Jim Cowles, advised Underwriters that Oryx was making a claim as an unlimited additional insured, not limited by the laws of Texas, the Drilling Agreement, or the terms of the Policy, and further demanded that Underwriters settle the Mote case up to their full policy limits of $26,000,000, or consent to the negotiation and resolution of the Mote litigation by Oryx and its counsel. As requested, the Underwriters gave Oryx consent to negotiate a settlement, reserving the right to be advised of any settlement proposed and to be given the opportunity to comment before it was agreed upon by Mote and his counsel. At that time the Underwriters also stated their position with respect to their obligations under the Policy to Oryx, Oryx's limited additional insured status, and the statutory limitation on Mallard's indemnity obligations.

While Oryx and the Underwriters debated coverage issues, settlement discussion in the underlying Mote litigation continued. Mr. Mote offered to settle his action against all defendants and the intervenor for payments of $6,000,000 in cash and $6,000,000 in annuities for his benefit, a total of $12,000,000. The Underwriters informed Oryx by letter that, in order to ensure that the favorable settlement not be lost to both themselves and to Oryx, the Underwriters would fund the settlement up to $11,050,000, and hold Oryx responsible and seek reimbursement for all sums paid in excess of Oryx's coverage.[2] The Underwriters specifically stated that the

funding of the settlement was not the act of a volunteer. *See* Plaintiffs' Ex. 16.

Thereafter, all of the parties entered into a Settlement Agreement with Mr. Mote in which three of the other parties to the litigation agreed to pay $950,000 of the $12,000,000. The Underwriters agreed to fund the remaining $11,050,000 on behalf of Oryx while reserving their rights to seek reimbursement for the amounts in excess of Mallard's indemnity obligations to Oryx. The Mote settlement was funded on April 10, 1996.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. FED.R.CIV.P. 56. Rule 56(e) requires that when a motion for summary judgment is made, the nonmoving party must set forth set forth specific facts showing that there is a genuine issue for trial. *Id.; See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. *Id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## III. WAIVER AND ESTOPPEL

Oryx claims that the Underwriters' payment of Mote's claim prohibits the Underwriters from now contesting coverage as a matter of law. In the alternative, Oryx as-

---

**2.** The Underwriters specifically informed Oryx that they intended to seek reimbursement of all sums in excess of $500,000, the statutory limit for unilateral indemnification under the Texas Anti–Indemnity Statute, and in the alternative, if

that limitation were not upheld, for reimbursement of amounts paid in settlement of Mr. Mote's claims for exemplary damages due to Oryx's gross negligence.

serts that the Underwriters' failure to communicate a reservation of rights to Oryx until well over a year into the Mote litigation constitutes a waiver and estoppel of their coverage defenses. The Court will address each of these theories in turn.

■ First, the Underwriters did not voluntarily pay the claim, and under binding Fifth Circuit authority, their funding of the Mote settlement did not waive any rights to assert coverage defenses or to seek reimbursement. The Fifth Circuit has recognized that Texas law does provide that "money voluntarily paid with full knowledge of all of the facts cannot be recovered back, although it was paid upon a void or illegal demand or upon a claim which had no foundation in fact and was paid without consideration." *Arkwright–Boston Manufacturers Mutual Insurance Co. v. Aries Marine Corp.*, 932 F.2d 442, 447 (5th Cir.1991) (citations omitted). However, the Fifth Circuit held that this rule only applies where there appears "an intention on the part of the payor to waive his rights." *Id.* (citations omitted). In this case, the Underwriters unambiguously informed Oryx that they intended to fund the Mote settlement without prejudice to their right to seek reimbursement of any amounts in excess of the Policy's coverage. This negates any claim of waiver.

■ Oryx next argues that the Underwriters are barred by their pre-settlement conduct from asserting their rights under the Policy. To prove waiver or estoppel, Oryx must show: "(1) that the insurer had sufficient knowledge of the facts or circumstances indicating non-coverage but (2) assumed or continued to defend its insured without obtaining an effective reservation of rights or non-waiver agreement and, as a result, (3) the insured suffered some type of harm." *Pennsylvania Nat'l Mut. Ins. Co. v. Kitty Hawk Airways, Inc.*, 964 F.2d 478, 481 (5th Cir.1992) (applying Texas law). A failure to establish any one of these three elements is all that is required to defeat a waiver or estoppel defense.

Although the Underwriters waited until one year after the filing of the Mote litigation to assert their reservation of rights, there is no evidence in the summary judgment record to support the claim that the Underwriters assumed or controlled Oryx's defense. In fact, the summary judgment evidence instead clearly shows that Mr. Killeen, Oryx's independent counsel in the Mote litigation, was hired by Mallard's Claims Manager. The Underwriters were not aware of Mr. Killeen's retention until after the fact. Furthermore, Mr. Killeen himself testifies by affidavit that he took instructions from no one but Oryx, and he acted as counsel at all times only for Oryx. The fact that the Underwriters were kept apprised of the Mote litigation by status reports is evidence only of a completely routine practice and does not create a question of fact that does not exist in the record. Furthermore, the Underwriters' participation in the negotiations of the ultimate Mote settlement does not constitute an assumption of Oryx's defense. *See Arkwright*, 932 F.2d at 445–46.[3] Therefore, because a failure to establish any one of the three elements is all that is required to defeat a waiver or estoppel defense, the Underwriters are not estopped from herein asserting its coverage defenses.

## IV. THE EXTENT OF ORYX'S COVERAGE

### A. *Texas State Law Applies*

■ Oryx argues that federal maritime law governs its Drilling Agreement with Mallard. In support of this position, Oryx points to the choice of law provision in the Drilling Agreement which calls for the application of general maritime law. However, the Fifth Circuit when confronted with a similar choice of law provision held:

Although Louisiana's choice of law rules might enforce this choice of law provision, OCSLA will not. We find beyond a doubt that OCSLA is itself a Congressionally mandated choice of law provision requiring

---

3. In *Arkwright*, the Fifth Circuit specifically held that where the insured was aware of and present during the insurer's settlement negotiations, and where the insured had negotiated with the insurer possible funding terms for the settlement, the insurer's participation in settlement negotiations did not constitute an assumption of the insured's defense. *Arkwright*, 932 F.2d at 445–46.

that the substantive law of the adjacent state is to apply even in the presence of a choice of law provision in the contract to the contrary. *Union Texas Petroleum Corp. v. PLT Engineering,* 895 F.2d 1043, 1050 (5th Cir.), *cert. denied,* 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990) (citations omitted). Therefore, the Court must look to the Outer Continental Shelf Lands Act (OCSLA), not the Drilling Agreement choice of law provision, to· determine the governing law in this case.

■ The Fifth Circuit articulated the proper test for determining whether state law provides the rule of decision in an OCSLA case in *PLT Engineering. PLT Engineering,* 895 F.2d at 1047.[4] The *PLT Engineering* test governing whether the OCSLA applies to a controversy consists of three factors: (1) the controversy must arise on a situs covered by OCSLA (*i.e.,* the subsoil, seabed, or artificial structures permanently or temporarily attached thereto); (2) federal maritime law must not apply of its own force; and (3) the state law must not be inconsistent with federal law. *Id.*

Applying the *PLT Engineering* test in this case reveals that Texas state law controls. Under the first part of the test, it is uncontroverted that the underlying incident, Mr. Mote's injury, took place in the Outer Continental Shelf, off the coast of Texas in the Gulf of Mexico. *See Mote v. Oryx Energy,* 910 F.Supp. 291 (E.D.Tex.1995) (Mote lacked standing as a consumer under the Texas Deceptive Trade Practices Act); *see also Mote v. Oryx Energy,* 893 F.Supp. 639 (E.D.Tex.1995) (Texas state law governs service of process under the OCSLA).

■ Under the second part of the *PLT Engineering* test, federal maritime law does not apply of its own force because the Drilling Agreement is nonmaritime in nature. The Fifth Circuit has defined a six-factor test for determining whether a contract is maritime in nature in *Davis & Sons, Inc. v. Gulf Oil Corp.,* 919 F.2d 313 (5th Cir.1990). The Drilling Agreement here fails to meet at least two elements of the *Davis* test as there was no vessel involved.[5] The Drilling Agreement indicates that a platform located at High Island Block 327 is the subject matter of the contract where Mallard was to drill, complete or workover the well for Oryx. Just as in *Hodgen,* Mallard's work was limited to an artificial island, *i.e.,* a fixed platform on High Island Block 327 on the Outer Continental Shelf off the coast of Texas. At the time of the accident, the Mallard crew was rigging up the necessary equipment to test the blowout preventer. There was nothing inherently maritime about the work. Although the incident occurred in navigable waters, Mote was on an artificial island, and not a vessel;[6] therefore, factors three and four of the *Davis* test are inapplicable and the contract in question is not a maritime contract. Consequently, federal maritime law does not apply of its own force. Instead, under OCSLA, the law of the adjacent state, ·Texas, applies.[7]

---

4. The Fifth Circuit recently affirmed its holding in *PLT Engineering* in *Hodgen v. Forest Oil Corp.,* 87 F.3d 1512 (5th Cir.1996).

5. The factors include: (1) What does the specific work order in effect at the time of the injury provide? (Answer: drill, workover or complete wells); (2) What work did the crew assigned under the work order actually do? (Answer: rigging up blowout preventer on oil well); (3) Was the crew assigned to work aboard a vessel in navigable waters? (Answer: No vessel was involved.); (4) To what extent did the work being done relate to the mission of the vessel? (Answer: No vessel was involved.); (5) What was the principal work of the injured worker? (Answer: floorhand on drilling rig); and (6) What work was the injured worker actually doing at the time of the injury? (Answer: rigging up blowout preventer).

6. Oryx argues that the injury occurred on Rig 42 which was movable, and that the rig was temporarily located on Oryx's fixed platform. However, the summary judgment evidence shows that while moveable, the rig could not float on water. Instead, it had to be placed on a barge and moved from the shore to the platform and vice versa. Rig 42 was just like any other piece of drilling equipment that was utilized on a fixed platform, an artificial island under OCSLA. Rig 42 was not truly a vessel as that term is understood since it could not float on water.

7. Neither of the parties argues that the state law is inconsistent with federal law. Therefore, the Court will assume consistency.

*B. Under Texas law, Oryx's Status as an Additional Assured is Limited to Mallard's Duty to Indemnify.*

■ Under the terms of the Policy, Oryx is an additional insured only to the extent of the indemnity provided by Mallard under the Drilling Agreement. Under the terms of the Drilling Agreement, Mallard was required in Schedule E to maintain certain insurance coverages. The Drilling Agreement specifically states that:

> [t]he policy (or policies) of insurance obtained by [Mallard], except Worker's Compensation, and Protection and Indemnity shall provide that [Oryx] . . . are additional insured for all coverages, *to the extent of the indemnity provided by [Mallard] under this Contract.*

Plaintiffs' Ex. 1, p. 38 (emphasis added). Thus, the Drilling Agreement required that Mallard support its indemnity of Oryx with certain insurance coverages. As a result, Mallard subscribed to the Policy at issue in this case.

Under the terms of the Policy itself, Section II, the excess liabilities portion, specifically defines:

> The unqualified word "Assured", wherever used in this Policy, includes: . . .
>
> (c) any . . . organization . . . to whom the Named Assured [Mallard] is obligated *by virtue of a written contract or agreement to provide insurance such as is afforded by this Policy, but only to the extent of such obligation* and in respect of operations by or on behalf of the Named Assured [Mallard].

Plaintiffs' Ex. 2, p. 23 (emphasis added). This is precisely what Schedule E of the Drilling Agreement required. However, Oryx argues that its insured status is not limited to the coverage of these provisions. Instead, Oryx argues that it is insured under multiple provisions of the Policy.

In trying to expand on the above definition, Oryx relies on several provisions elsewhere in the Policy. However, it is clear under Texas law that the more specific language of Section II controls over the general language on which Oryx relies. When construing a contract, the Court's primary concern is to give effect to the written expression of the parties' intent. In doing so, the Court is bound to read all parts of a contract together to ascertain the agreement of the parties. "For example, when a contract provision makes a general statement of coverage, and another provision specifically states the time limit for such coverage, the more specific provision will control." *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133–34 (Tex.1994) (citations omitted).

Oryx first points to the Automatic Additional Assured provisions contained in the Declarations and General Conditions portion of the Policy which define two categories of additional assureds. The first category includes ". . . any . . . corporation . . . for whom or with whom the Assured [Mallard] may be operating is hereby named as an additional assured when required." Plaintiffs' Ex. 2, p. 9. The general reference "when required" clearly refers to specific language in Section II "when obligated by virtue of a written contract." Therefore, as this provision adds nothing to the more specific provision in Section II, this general provision is controlled by the specific language in Section II.

The second category of additional assureds includes ". . . any . . . corporation . . . who possesses a Certificate of Insurance with regard to this Policy, duly executed by Soriero & Seffens, Inc., shall be deemed to be an additional assured . . ." Plaintiffs' Ex. 2, p. 9. Oryx was issued a Certificate of Insurance by Mallard's Insurance Broker, Soriero & Seffens, Inc., dated October 19, 1993. The Certificate expressly stated that Oryx was an additional insured "as required by written contract." This general reference again is controlled by the specific provisions of Section II limiting the coverage to the extent of the indemnity provided for in the contract.

■ Furthermore, any coverage bestowed by virtue of the certificate is invalid under the rationale of the "known loss" rule. Under the known loss doctrine, it is contrary to public policy for an insurance company knowingly to assume the burden of a loss that occurred prior to making the contract. *Burch v. Commonwealth Mutual Insurance Co.,* 450 S.W.2d 838, 840–41 (Tex.1970). The

rationale behind the doctrine rests in the fortuity requirement. The fortuity requirement precludes insurance coverage for damage that the insured knows about when the policy is issued, or in this case when it is added as an additional assured. *Two Pesos, Inc. v. Gulf Insurance Company,* 901 S.W.2d 495, 501 (Tex.App.—Houston [14th Dist.] 1995, no writ); *see also Drewett v. Aetna Cas. & Sur. Co.,* 539 F.2d 496, 498 (5th Cir.1976). Texas courts have consistently held that agents do not have authority to bind an insurer after the loss has occurred. *Burch,* 450 S.W.2d at 840–41. The Certificate of Insurance issued by Soriero & Seffens is dated October 19, 1993, ten (10) days after the loss in question. Therefore, under the known loss doctrine, there is no coverage available to Oryx for the Mote accident under the Automatic Additional Assured provision in the Declarations and General Conditions Section.

■ Oryx also argues that under Section II of the Policy, it is entitled to coverage under subsection (d) of the definition "Assured" which includes:

(d) any additional Assured (not being the Named Assured under this Policy) included in the Underlying Insurances …

Plaintiffs' Ex. 2, p. 23. This subsection refers to the definition of "Assured" in Section IV of the Policy, the underlying comprehensive general liability section. However, Oryx is not designated in the declarations as a named insured, nor is it listed in the declarations as an individual or a partnership or a joint venture. Therefore, because Oryx is not designated at all as required by Section IV, it is not entitled to coverage under subsection (d).

■ Therefore, Oryx is an additional insured only to the extent permitted by the specific definition of "assured" set forth in Section II, quoted above. This specific provision of the Policy provides that Oryx is an insured only to the extent required by contract, in this case, the Drilling Agreement. Provisions in a contract are not to be isolated and considered apart from other provisions. *Forbau,* 876 S.W.2d at 133–34. However, when an insurance contract provision makes a general statement of coverage, and another provision specifically limits it, the more specific provision will control. *Id.* Reading the Policy provisions related to additional assureds as a whole, and not in isolation, it is clear that the specific provision making Oryx an additional assured to the extent of Mallard's obligation to indemnify it is controlling. In short, the more specific language controls over the general language on which Oryx relies.

*C. Under the Texas Anti–Indemnity Statute, Mallard's Indemnity of Oryx is Unilateral and, therefore, Limited to $500,000.*

■ Oryx is an additional insured only to the extent of the indemnity provided by Mallard under the Drilling Agreement. Therefore, the Court must look to the Texas Anti–Indemnity Statute (TAIS) to determine to what extent the indemnity is enforceable. The TAIS establishes that agreements pertaining to wells for gas, oil and other minerals that provide for indemnification of a negligent indemnitee are against the public policy of the state of Texas. TEX.CIV.PRAC. & REM.CODE § 127.002(b). The statute establishes the general rule that such indemnity agreements relating to personal injuries are void and unenforceable. TEX.CIV.PRAC. & REM.CODE § 127.003(a). However, the statute does carve out certain limited exceptions to this general rule in section 127.005. This provision provides:

(a) This chapter does not apply to an agreement that provides for indemnity if the parties agree in writing that the indemnity obligation will be supported by liability insurance coverage to be furnished by the indemnitor subject to the limitations specified in Subsection (b) or (c).

(b) With respect to a mutual indemnity obligation, the indemnity obligation is limited to the extent of the coverage and dollar limits of insurance or qualified self-insurance each party as indemnitor has agreed to provide in equal amounts to the other party as indemnitee.

(c) With respect to a unilateral indemnity obligation, the amount of insurance required may not exceed $500,000.

Tex.Civ.Prac. & Rem.Code § 127.005. The crux of this case depends on the interpretation of these statutory exceptions.

Oryx argues that the statute provides a broad general exception to the rule of unenforceability: an indemnity obligation is generally enforceable if the parties agree in writing that it will be supported by liability insurance coverage to be furnished by the indemnitor. *See* Tex.Civ.Prac. & Rem.Code § 127.005(a). Oryx argues that although this broad exception is limited by subsections (b) and (c), neither of those limitations applies in this case.[8]

The Court does not agree with this interpretation. In the absence of a statute or case which compels the Court to read it differently, the Court must give the language of the statute its most narrow construction. Oryx's argument, while plausible, goes against the intent of the statute. The TAIS clearly and broadly states that certain indemnity agreements, such as the one at issue here, are against the public policy of the state. Therefore, such agreements are void and unenforceable, except where they fall within very specific and limited exceptions. If the Court were to construe the TAIS as Oryx argues, reading subsection (a) without the limitations of subsections (b) and (c), the result would be an improper expansion of the range of possible exceptions. The statute clearly intends that subsection (a) be read in conjunction with either subsection (b) or (c). Although the statute is perhaps poorly drafted, it is clear that the Legislature intended the definitions of a "mutual indemnity obligation" and a "unilateral indemnity obligation" to encompass the entire field of indemnity obligations.

The indemnity obligation at issue here best meets the statutory definition of a "unilateral indemnity obligation."[9] The TAIS defines a unilateral indemnity obligation as:

> an indemnity obligation in an agreement pertaining to a well for oil, gas, or water or to a mine for a mineral in which one of the parties as indemnitor agrees to indemnify the other party as indemnitee with respect to claims for personal injury or death to the indemnitor's employees or agents or to the employees or agents of the indemnitor's contractors *but in which the indemnitee does not make a reciprocal indemnity to the indemnitor.*

Tex.Civ.Prac. & Rem.Code § 127.001(6) (emphasis added). Although the indemnity provisions of the Drilling Agreement attempt to create a mutual indemnity obligation between Oryx and Mallard, the fact that the Drilling Agreement only requires Mallard to procure liability insurance to support its indemnity obligation defeats this attempt. The Drilling Agreement contains no provision requiring Oryx to provide any insurance at all in any amount to meet its indemnity obligation to Mallard.[10] Because the parties were not equally required to support their indemnity obligations with insurance in equal amounts, the indemnity is *not* reciprocal. Therefore, the indemnity meets the definition of a unilateral indemnity obligation under the TAIS.

As a unilateral indemnity obligation, the agreement between Oryx and Mallard is subject to the limitation in subsection (c) of § 127.005. That provision specifically states that the "amount of insurance required may not exceed $500,000." Tex.Civ.Prac. & Rem. Code § 127.005(c). Consequently, this is the extent of Mallard's indemnity obligation to Oryx.[11]

---

8. Oryx argues that subsection (b) does not apply because the indemnity does not meet all of the elements of the definition of a "mutual indemnity obligation" in § 127.001(3). Specifically, the parties did not agree to indemnify each other's contractors or their employees. Oryx also concludes that subsection (c) does not apply because the parties gave each other mirror indemnities; therefore, the indemnity does not meet the definition of a "unilateral indemnity obligation" as defined in § 127.001(6).

9. Oryx admits that the indemnity obligation does not meet the statutory elements of a "mutual indemnity obligation." Oryx's Response at 23; *supra* note 8.

10. The Drilling Agreement also does not require qualified self-insurance of Oryx.

11. Nonetheless, Oryx argues that the TAIS may not be used to invalidate existing insurance coverage and that it is entitled to the insurance "actually obtained." However, the case on

## V. CONCLUSION

The Court has found as a matter of law that: (1) the Underwriters did not waive, and are not estopped from asserting, any coverage defenses under the Policy; (2) under the OCSLA, Texas law applies to this dispute; (3) under Texas state law, Oryx is an additional insured under the Policy only to the extent of the indemnity agreement; and (4) under the TAIS, the extent of the indemnity is limited to $500,000.[12] Accordingly, the Underwriters are entitled to reimbursement for all amounts funded in excess of their limits of liability of $500,000, i.e., $10,550,000. The Court acknowledges the Plaintiffs' Motion to Supplement the Record, filed on February 14, 1997, in which the Plaintiffs' seek still an additional amount to be reimbursed. However, given the fact that the Motion was filed at the eleventh hour, and the paucity of the record in support of that Motion,[13] the Court **DENIES** reimbursement of those amounts.

For the reasons set forth above, the Plaintiffs' Motion for Summary Judgment is **GRANTED,** the Defendant's Cross–Motion for Summary Judgment is **DENIED,** and all claims are hereby **DISMISSED WITH PREJUDICE.** Each party shall bear its own costs incurred herein to date.

The Court sincerely appreciates the efforts of all counsel involved in this dispute. The briefs submitted by the parties were extremely helpful to the Court's resolution of the difficult issues presented by this case. The Court's decision was reached only after careful and searching review of the facts of the case and the arguments of the parties, and the Court believes there is no further relief it can provide. Therefore, without in any way attempting to limit the relief the parties may seek from other courts, the Court hereby directs the parties to file nothing further in this case in this Court, especially Motions to Reconsider or the like, unless they can present compelling and relevant new evidence or legal authority which they could not, through the exercise of due diligence, have presented upon the original submission of the summary judgment motions. Any and all further relief in this case shall be sought in due course from the United States Court of Appeals for the Fifth Circuit.

**IT IS SO ORDERED.**

### *FINAL JUDGMENT*

For the reasons set forth in the Court's Order entered this date, the Plaintiffs' Motion for Summary Judgment is hereby **GRANTED,** and the Defendant's Cross–Motion for Summary Judgment is hereby **DENIED.** All parties are **ORDERED** to bear their own costs incurred herein to date.

**THIS IS A FINAL JUDGMENT.**

**IT IS SO ORDERED.**

---

which Oryx relies, *Campbell v. Sonat Offshore Drilling,* 979 F.2d 1115 (5th Cir.1992), does not control the instant case because the Campbell Court interpreted a predecessor version of the TAIS which did not define or distinguish mutual or unilateral indemnity obligations, and did not require that a mutual indemnity obligation be limited to the dollar amounts of insurance that each party as indemnitor has agreed to provide in equal amounts.

12. The Court, therefore, does not reach the Underwriters' alternative argument relating to punitive damages.

13. The Underwriters' submit only one affidavit in support of these amounts. Moreover, if the reimbursement of these costs had been crucial to the Underwriters' case, the parties would have briefed their claims within their original motions for summary judgment. Indeed, the parties have exhaustively briefed every other aspect of this case. The Court is expressly not asking for supplemental briefs on the issue of these defense costs. The Court has spent literally hundreds of hours considering the intricate issues of this case already; the Court will only consider those claims that have already been brought to the Court's attention.