NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,
Plaintiff–Appellant,

v.

THE STROH COMPANIES, INC. and
The Stroh Brewery Company,
Defendants–Appellees.

No. 00–7345.

United States Court of Appeals,
Second Circuit.

Argued Nov. 29, 2000.

Decided Sept. 06, 2001.

Eugene Wollan, Mound, Cotton & Wollan (Jeffrey S. Weinstein and Alyssa DeSimone, of counsel), New York, NY, for Plaintiff–Appellant.

Dwight B. Palmer, Palmer and Associates (Stanley Nardoni, of counsel), Chicago, Illinois; James J. Maloney, Kavanagh Maloney & Osnato, LLP, New York, NY, for Defendants–Appellees.

Before POOLER and SACK, Circuit Judges, and MARTIN, District Judge.*

SACK, Circuit Judge:

On November 30, 1998, plaintiff National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") brought this declaratory judgment action against The Stroh Companies, Inc. and its wholly owned subsidiary, The Stroh Brewery Company (collectively, "Stroh"), in the

* The Honorable John S. Martin, Jr., of the United States District Court for the Southern District of New York, sitting by designation.

United States District Court for the Southern District of New York. National Union seeks to avoid liability under a "Contaminated Products Insurance" policy (the "Policy") issued to The Stroh Companies and its affiliates and subsidiaries. The claim arose from a product recall initiated by Stroh in response to glass contamination discovered in beverages bottled at a plant that was formerly owned by the Heileman Companies ("Heileman") and was acquired by Stroh, along with Heileman's other assets, after the Policy took effect. At Stroh's request, National Union extended coverage to Heileman and its assets under the Policy as of the date of the acquisition. Stroh initiated the recall at issue in this case approximately six weeks after Heileman was added to the Policy.

National Union's amended complaint alleges that Stroh and Heileman knew or should have known of the contamination problem and the need for a recall before Heileman was added to the Policy, and that coverage is therefore barred both by the express terms of the Policy and by the insurance-law principles of "fortuity" and "known loss." National Union further claims that Stroh breached several other provisions of the Policy, including the requirement that Stroh disclose material facts to National Union. Finally, National Union seeks a declaration that even if covered under the Policy, Stroh's claim is subject to more than one deductible. The district court (Denise Cote, *Judge*) granted summary judgment to Stroh on all of National Union's claims. This appeal followed.

We conclude that (1) the district court correctly interpreted the Policy to exclude coverage only for losses known to the insured as of the original inception date of the Policy; (2) assuming that the fortuity and known loss doctrines operate independently of specific policy provisions, they do not bar coverage in the present case; (3) neither Stroh nor Heileman breached the Policy's due diligence, cooperation, or disclosure provisions; and (4) Stroh's claim is subject to a single deductible. We therefore affirm the district court's grant of summary judgment for Stroh as to all of National Union's claims.

## BACKGROUND

On May 12, 1995, National Union issued a "Contaminated Products Insurance" policy to Stroh and its "subsidiary and affiliated companies or entities." The Policy requires National to reimburse Stroh for "Loss[es]," a defined term that includes costs incurred by Stroh in the course of recalls of Stroh products resulting from "Accidental Contamination." The Policy excludes coverage of "Loss[es]" that the insured, "as of the inception date of [the] [P]olicy," knew or should have known had occurred or were likely to occur.

The original policy period ran from May 12, 1995 to May 12, 1996. In April 1996, Stroh, through its insurance broker Aon Risk Services, contacted National Union, through its underwriting manager American International Underwriters, regarding possible renewal of the policy. On May 1, 1996, Stroh completed an application for an extension of the policy, and on May 10, 1996, the parties executed Endorsement No. 4, which "extended" the policy period for the period from May 12, 1996 to May 12, 1997.

At the time of the extension, Stroh was in negotiations with Heileman regarding Stroh's possible acquisition of Heileman's assets. Sometime early that month, Stroh asked National Union whether it would be willing to extend the Policy's coverage to Heileman after the acquisition was complete. On May 3, 1996, National Union asked Stroh for information relating to,

among other things, Heileman's revenues, "[p]roduction facilities location," and other information "concerning 'Heileman' inclusion [sic] under the [Policy]." Stroh complied. On May 21 and May 28, National Union offered either to "[i]nclude Heileman under the existing policy with no changes to terms" for an additional premium, or to "[c]ancel the existing policy" and issue a "new policy for Stroh & Heileman" with revised terms. Stroh chose the former, and National Union agreed.

On July 1, 1996, Stroh completed its acquisition of Heileman's assets and liabilities. On August 5, 1996, Stroh and National Union executed Endorsement No. 5 to the Policy, which extended coverage to Heileman and its products under the existing Policy effective July 1, 1996. National Union agreed to the Endorsement without requiring a new application or asking Stroh to disclose specific risks carried by Heileman or its products.

Among the Heileman assets acquired by Stroh was a plant in Perry, Georgia, which bottled "Arizona Iced Tea" brand beverages pursuant to a contract with the manufacturer of the product, Hornell Brewing Companies ("Hornell"). The disputed insurance claim in this case involves a recall of "Arizona Iced Tea" products ordered by Stroh after glass shards were discovered in several bottles filled at the Perry plant. It is undisputed that these euphemistically termed "glass inclusions" were caused by a defect in the Perry plant's "hot-fill" procedure, which caused hot liquids to be poured into glass bottles that had been allowed to cool to too low a temperature. The resulting "thermal shock" apparently caused occasional breakage in the bottles.

The principal factual issue in this case concerns what Stroh and Heileman knew about this glass breakage problem and when they knew it. National Union asserts that Heileman knew and Stroh knew or should have known of the problem before July 1, 1996, the date as of which Heileman was added to the Policy. Stroh, on the other hand, contends that it first learned of the problem in August 1996, and that although Heileman was aware of some instances of glass breakage, it did not know the extent of the problem until sometime after Heileman had been added to the Policy.

On August 12, 1996, Stroh began an investigation of the problem and halted production at the Perry facility. On August 20, 1996, Stroh notified National Union that it had initiated a recall and would be seeking coverage under the Policy. National Union then began what turned out to be a seventeen-month investigation of Stroh's claim. On February 24, 1998, after the investigation was completed, National Union formally disclaimed coverage.

National Union followed up its disclaimer by initiating the present diversity action on November 30, 1998 seeking declaratory judgment on six issues: that Stroh's recall costs are not covered under the Policy because the defendants knew of the broken glass contamination problem before Heileman was added to the Policy (Count I); that Stroh failed to exercise due diligence, in breach of Condition O of the Policy (Count II); that Stroh breached Conditions Q and R by failing to cooperate with National Union's claims investigation (Count III); that Stroh breached Condition W by failing to disclose material information regarding the Heileman risks (Count IV); that Stroh breached Condition J by failing to investigate the glass inclusion problems (Count V); and that Stroh's claim, if covered, is subject to more than one deductible (Count VI).

In May 1999, Stroh filed a motion pursuant to Fed.R.Civ.P. 9(b) and 12(e) to require plaintiff to replead any allegations of fraud with greater particularity. The dis-

trict court dismissed the motion as moot because National Union had stated its intention not "to prove or rely upon a theory of fraud in its case at trial." *National Union Fire Ins. Co. v. Stroh Companies, Inc.*, No. 98 CIV. 8428(DLC), 1999 WL 619635, at *2, 1999 U.S. Dist. LEXIS 12580, at *6 (S.D.N.Y. Aug.16, 1999) ("*National Union I*").

Prior to the completion of discovery, Stroh moved for summary judgment on all six counts. While that motion was pending, National Union moved pursuant to Fed.R.Civ.P. 56(f) for leave to conduct additional discovery.

In December 1999, the district court granted summary judgment for Stroh on Counts I, III, IV, and V, but denied summary judgment as to Counts II and VI. *See National Union Fire Ins. Co. v. The Stroh Companies, Inc.*, No. 98 CIV. 8428(DLC), 1999 WL 1267461, 1999 U.S. Dist. LEXIS 19801 (S.D.N.Y. Dec.29, 1999) ("*National Union II*"). The court also denied National Union's motion for time to conduct additional discovery. *See id.*, 1999 WL 1267461, at *8, 1999 U.S. Dist. LEXIS 19801, at *23–*24.

National Union subsequently moved for reconsideration of *National Union II*, and the district court granted both parties leave to file supplemental briefs as to Counts II and VI. In a thoughtful and thorough opinion dated March 8, 2000, the district court granted summary judgment to Stroh on Counts II and VI and denied National Union's motion for reconsideration on the other counts. *See National Union Fire Ins. Co. v. The Stroh Companies, Inc.*, No. 98 CIV. 8428(DLC), 2000 WL 264320, 2000 U.S. Dist. LEXIS 2581 (S.D.N.Y. Mar.9, 2000) ("*National Union III*"). This appeal followed.[1]

## DISCUSSION

### I. Standard of Review.

We review the district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party. *See Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir.1999), *cert. denied*, 529 U.S. 1098, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000). Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

■ The parties agree that the Policy is to be interpreted according to New York law, under which insurance policies, like other contracts, are to be construed so as to give effect to "the intent of the parties as expressed by their words and purposes." *In re Prudential Lines Inc.*, 158 F.3d 65, 77 (2d Cir.1998). "Unambiguous terms are to be given their plain and ordinary meaning," and "ambiguous language should be construed in accordance with the reasonable expectations of the insured when he entered into the contract." *Id.* (citation and internal quotation marks omitted). As the district court noted, "[i]nterpretation of an insurance policy is a legal question, unless ambiguous language

---

1. National Union does not appeal from the district court's dismissal of Count V.

in the policy can only be resolved by examination of contested extrinsic evidence, in which case it is a question of fact." *National Union II*, 1999 WL 1267461, at *3, 1999 U.S. Dist. LEXIS 19801, at *7 (citing, *inter alia, In re Prudential Lines Inc.*, 158 F.3d at 77).

## II. Whether the Recall Was a Covered "Loss"

### A. Overview

Count I of National Union's amended complaint seeks a declaration that the Policy does not cover Stroh's claim because Stroh "knew or could have reasonably been expected to know that a Loss had occurred or was likely to occur on or before July 1, 1996," the effective date of Heileman's inclusion under the Policy. The alleged cause of action is based on paragraph I of the Policy, which requires National Union to reimburse Stroh for

> its Loss ... caused by or resulting from any of the following Insured Events, discovered during the Policy Period ... provided that the Insured *as of the inception date of this policy* did not know nor could have reasonably been expected to know that such Loss had occurred or might likely occur.

(Emphasis added). An "Insured Event" is defined to include an accidental contamination of covered products, and a "Loss" includes recall costs incurred as a result of an "Accidental Contamination."

The Policy does not explicitly define the term "inception date." But a set of "declarations" on National Union letterhead accompanying the original Policy states that the "Policy Period" runs from May 12, 1995 to May 12, 1996, and it is undisputed that May 12, 1995 was the Policy's original "inception date." National Union contends, however, that this date was later altered by either Endorsement No. 4, which extended the policy period from May 12, 1996 to May 12, 1997, or Endorsement No. 5, which extended coverage to Heileman as of July 1, 1996, or both.

The district court rejected this argument, concluding that the Policy provides for only one inception date, and that date was May 12, 1995. *See National Union II*, 1999 WL 1267461, at *3, 1999 U.S. Dist. LEXIS 19801, at *8. Because Stroh could not have known of any problems at the Perry plant on that date—they are not alleged to have performed any due diligence with respect to the Heileman assets at that time and the problems at the Perry plant had in any event not yet begun—the district court concluded that Paragraph I did not bar coverage. *See id.*, 1999 WL 1267461, at *3 *4, 1999 U.S. Dist. LEXIS 19801, at *8–*9; *National Union III*, 2000 WL 264320, at *7–*8, 2000 U.S. Dist. LEXIS 2581, at *19–*20.

On appeal, National Union contends (1) that the district court misconstrued the Policy in determining the "inception date," and (2) that the insurance-law concepts of "known loss" and "fortuity" bar coverage of Stroh's claim irrespective of the specific Policy language.

### B. Inception Date

■ We agree with the district court's conclusion that the Policy's "inception date" was May 12, 1995. As the court noted, "[t]he term 'inception date' [in the Policy] refers to a singular event," and that term is used "in conjunction with the phrase 'this policy.'" *National Union II*, 1999 WL 1267461, at *3, 1999 U.S. Dist. LEXIS 19801, at *8. The only plausible interpretation is that the Policy was thus subject to only one "inception date"—the date on which coverage under the Policy originally became effective, May 12, 1995.

■ Neither of the Endorsements on which National Union relies alters this

conclusion. Endorsement No. 4 is a "Coverage Continuation Endorsement" which reads in pertinent part:

> Item II "Policy Period" of "Declaration" [sic] page has been *extended* to read:
> Item II Policy Period
> From: May 12, 1996
> To: May 12, 1997.

(Emphasis added).

The district court contrasted this language with the parties' use of the word "amended"—within the same endorsement as well as Endorsements Nos. 1, 2, and 3—to alter the substance of provisions of the Policy. The court thus held that Endorsement No. 4 "extended" the duration of the Policy, the inception of which was May 12, 1995, rather than "amending" the Policy to create a new "inception date."

Even if Endorsement No. 4 amended the terms of the original Policy, as National Union asserts, it did so only with respect to the "Policy Period" and not the "inception date." It is undisputed that when the parties executed Endorsement No. 4, they did not create a new policy. Rather, the endorsement "form[ed] a part of" the original Policy and "extended" coverage under that policy for an additional year, while specifying that "[a]ll other terms, conditions and exclusion [sic] of the original policy will remain unchanged." Thus, the original Policy exists over multiple "Policy Period[s]." Had the parties wished to achieve the result now urged by National Union, they could have drafted Paragraph I to exclude coverage for losses known or suspected as of the beginning or inception of the current "Policy Period." Paragraph I of the Policy, however, refers to "the inception date of *this policy*," making it clear that the inception date is defined in relation to the Policy as a whole rather than in relation to any particular "Policy Period." Therefore, an extension of the "Policy Period" in an endorsement cannot change the inception date of the Policy as a whole, which was May 12, 1995.

■ Endorsement No. 5 likewise states that "effective July 1, 1996, the coverage provided under [the Policy] has been extended" to include Heileman, and that "[a]ll other terms, conditions and exclusions of the original policy will remain unchanged." The endorsement thus leaves intact the language creating a single inception date for the Policy and setting May 12, 1995 as that date. *Cf. St. Paul Fire & Marine Ins. Co. v. MetPath, Inc.*, 38 F.Supp.2d 1087, 1093–95 (D.Minn.1999) (holding that policy language barring coverage for damages known to insured before policy's "effective date" did not apply to damages sustained by subsidiary acquired by original insured after effective date).

National Union contends that Endorsement No. 5 creates a separate inception date "with respect to th[e] specific risk" at issue in this case. Appellant's Br. at 18. But nothing in the Policy or any of the subsequent endorsements supports the view that each insured risk was given its own "inception date."

National Union further contends that any interpretation of the Policy that requires coverage of risks that the parties did not contemplate when the Policy first took effect is unreasonable. Yet National Union has been exposed to no risks beyond those contemplated by the plain language of the Policy and subsequent endorsements, including those pertaining to the loss for which National Union now seeks to avoid liability. *See MetPath*, 38 F.Supp.2d at 1094 (rejecting argument that policy interpretation that "expos[ed] [the insurer] to risks that it did not intend in issuing the policy" is unreasonable). National Union could have avoided exposure to risks known to Heileman or Stroh

at the time Heileman was added to the Policy by asking Stroh about them, or by specifically excluding such risks in the Policy or Endorsement No. 5. *See id.* (noting that if the insurer meant to exclude risks known at the time coverage was extended to after-acquired companies, "it should have clearly worded the language of the Policy to say this").

■ The district court thus correctly held that the "inception date" of the Policy was May 12, 1995, and correctly concluded that the "known or suspected Loss" provision of Paragraph I therefore did not bar coverage for the recall at issue.

### C. Known Loss and Non–Fortuity Doctrines

National Union next argues that even if the district court properly construed the Policy, the "fortuity" and "known loss" doctrines bar coverage of Stroh's claim as a matter of law.

Broadly stated, the fortuity doctrine holds that "insurance is not available for losses that the policyholder knows of, planned, intended, or is aware are substantially certain to occur." Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 8.02, at 248 (5th ed.1991) (collecting cases). New York has codified a somewhat narrower version of the doctrine under which an "insurance contract" is defined as an agreement by one party to pay another "upon the happening of a fortuitous event," meaning "any occurrence or failure to occur which is, or is assumed by the parties to be, to a substantial extent beyond the control of either party." N.Y. Ins. Law § 1101(a)(1)-(2).

The "known loss" defense is a variation on the fortuity theme. It holds that "an insured may not obtain insurance to cover a loss that is known before the policy takes effect." *Stonewall Ins. Co. v. Asbestos*

*Claims Mgt. Corp.,* 73 F.3d 1178, 1214 (2d Cir.1995), *modified on other grounds,* 85 F.3d 49 (2d Cir.1996); *see also Henry Modell & Co. v. Gen. Ins. Co. of Trieste & Venice,* 193 A.D.2d 412, 412–13, 597 N.Y.S.2d 75, 75 (1st Dep't 1993) (citing N.Y. Ins. Law § 1101(a) as authority for known loss doctrine).

*1. Impact of Policy Language.* The district court concluded that the Policy itself defeats a "known loss" defense here by excluding coverage only for losses known by the insured as of the "inception date." *See National Union III,* 2000 WL 264320, at *8–*9, 2000 U.S. Dist. LEXIS 2581, at *20–*21. The court rejected National Union's contention that the known loss and fortuity doctrines exist independently of and override specific policy provisions. *See id.*

Like the district court, we have found no specific authority—the parties have cited none—for or against the proposition that New York law would bar coverage for known losses covered by an insurance policy by means of amendments made to the policy after the inception date, even where the policy itself bars coverage only for losses known on the "inception date." We also share the district court's reluctance to announce such a rule in the absence of clear guidance from state courts. "Our role as a federal court sitting in diversity is ... not to adopt innovative theories that may distort established state law." *City of Johnstown v. Bankers Std. Ins. Co.,* 877 F.2d 1146, 1153 (2d Cir.1989).

New York law does not leave us entirely without guidance on this issue, however. As noted, a variation of the fortuity principle is incorporated by statute into the very definition of an insurance contract. *See* N.Y. Ins. Law § 1101(a)(1)-(2). New York courts have accordingly applied this principle to deny coverage without reference to

specific contract language, *see Henry Modell & Co.*, 193 A.D.2d at 412–13, 597 N.Y.S.2d at 75–76 (holding that no insurance coverage exists when, *inter alia*, "the damages claimed occurred prior to the inception of the policy and were fully known to the plaintiff ... before the commencement of coverage"), and, in *Stonewall*, in describing the "known loss" doctrine under New York law, we said that "insurance cannot be validly purchased" for known losses, 73 F.3d at 1215. We also said in *Stonewall* that "the 'known loss' defense" is "distinct" from a defense based on policy language excluding coverage for injuries that were " 'expected or intended' " by the insured. *Id.*

It is but a short leap from these formulations to a more specific rule, articulated in other jurisdictions, that fortuity and known loss principles are integral to the nature of insurance and thus apply as a matter of public policy, irrespective of specific policy terms. *See, e.g., Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1447 (3d Cir.1996) (predicting that Pennsylvania courts would hold that public policy bars enforcement of insurance contracts purporting to cover known losses); *Univ. of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1282 (6th Cir.1995) ("[I]t is against public policy to allow insurance coverage on a certainty.") (internal quotation marks omitted); *Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27, 29 (1st Cir.1981) (describing insurance contracts as a "wager against the occurrence or non-occurrence of a specified event," such that "the carrier insures a risk, not a certainty"). *See generally* Lee R. Russ & Tomas F. Segalia, 7 *Couch on Insurance 3d* § 102:9, at 102–26 (1997) ("[T]he known loss doctrine essentially reforms the contract to exclude the known loss, apparently under the assumption that no reasonable insurer would assume such a 'risk.' "); Ostrager & Newman, *supra*, § 8.02[a], at 250

("The overwhelming majority of courts ... have ... limited insurance coverage, regardless of the language of a particular policy, to fortuitous or accidental events.") (collecting cases).

Applying these principles, at least two courts in other jurisdictions have held that coverage would be barred where an existing policy is extended to cover new parties which then file claims for damages if the evidence showed that the insured parties had sustained and were aware of the damages before being added to the policy. *See Certain Underwriters at Lloyd's v. Oryx Energy Co. .*, 957 F.Supp. 930, 936–37 (S.D.Tex.1997), *rev'd on other grounds;* 142 F.3d 255 (5th Cir.1998); *Cont'l Ins. Co. v. Beecham, Inc.*, 836 F.Supp. 1027, 1046 (D.N.J.1993).

The district court thus may have erred in tying National Union's known loss defense strictly to the Policy's language. We need not predict nor ask the New York Court of Appeals what New York law is on this subject, however, because we conclude that even if the fortuity and known loss doctrines override specific policy language in New York, they are inapplicable on the facts of this case.

*2. Known Risk.* National Union argues that there is at least a triable issue of fact as to whether the Loss was known before July 1, 1996 because Heileman and Stroh knew or should have known on that date that the recall was likely. We disagree.

■ We begin with the obvious and apparently undisputed conclusion that a "Loss" as defined in the Policy—which includes expenses incurred in connection with a recall—is a "loss" for purposes of the known loss doctrine. The loss in question in this case—i.e., the cost of the Perry recall—undoubtedly occurred after Heileman was added to the Policy. If, on July 1, Stroh or Heileman knew of a broken

glass problem that made a recall likely, it does not follow that the recall, and therefore the expenses in connection with the recall, were known on July 1. In other words, National Union seems to argue that the fortuity doctrine bars coverage not only for known losses but for *likely* losses, i.e., known enhanced risks. We have expressly rejected the existence of such a "known risk" doctrine under New York law. *See City of Johnstown*, 877 F.2d at 1152–53.

■ In *City of Johnstown*, an insured landowner sought coverage under a liability policy for cleanup costs associated with contaminated land. The landowner allegedly knew of the contamination when it purchased insurance, but did not know whether and to what extent it would be held liable for the contamination. We noted that New York law bars coverage for known losses but does not recognize the "broader proposition that a risk, once 'known' is uninsurable." *Id.* at 1153; *see also Stonewall*, 73 F.3d at 1215 (holding that New York law did not bar coverage of damages even though the insured knew, before the inception date of its policies, "that its products risked asbestosis and cancer diseases and had received a large number of claims").

■ In Stroh's case, similarly, there had been no "Loss" at the time Heileman was added to the policy; there was only the risk of a "Loss." Even if the risk was known, and known to be high, at that time—a question hotly in dispute—the known loss doctrine does not bar coverage.

The rule announced in *City of Johnstown* does not leave insurers unprotected under New York law when insuring such risks. It simply makes clear that such protection lies not in a "known risk" rule but in narrower and better-established

doctrines, such as rules barring recovery (1) where the insured fraudulently conceals or misrepresents a loss, imminent loss, or other material fact, and (2) for "damages that are 'expected' or 'intended' by the insured" where the policy so provides. *City of Johnstown*, 877 F.2d at 1153.

Neither of these narrower doctrines is applicable here. National Union has disclaimed any allegation that the defendants fraudulently concealed or withheld material information. *See National Union I*, 1999 WL 619635, at *2, 1999 U.S. Dist. LEXIS 12580, at *6. And *City of Johnstown*'s reference to damages " 'expected' or 'intended' by the insured" arose in the context of our interpretation of standard language in the liability policy there in issue excluding coverage for such damages, and thus is not directly applicable in this case. In other words, we held there that the parties may avoid insuring known risks in part through their own draftsmanship. As we have already observed, the pertinent language of the Policy in this case—i.e., the exclusion for Losses that Stroh knew had occurred "or might likely occur"—applies only to Stroh's knowledge as of the "inception date."

*3. Knowledge of Inevitable Loss.* National Union argues, however, that at the time Heileman was added to the Policy, even though the "Loss" in question had not occurred, it was not merely a risk but a certainty. National Union makes two separate arguments in this regard: that because Stroh and Heileman knew that a recall was necessary but delayed initiating one until Heileman was covered under the Policy, the Loss was (1) "known" for purposes of the known loss doctrine, and (2) non-fortuitous under New York law since it was not "beyond the control of either party." N.Y. Ins. Law § 1101(a)(2).[2] We

2. The district court did not reach the factual

or legal basis of these arguments because it

consider the first of these theories here, and the second in Part II.C.4, below.

National Union's notion that the known loss doctrine bars coverage not merely for losses that the insured knows have already occurred at the time insurance is purchased, but also for losses that have not occurred but the prospective insured knows inevitably will occur is not without support. *See, e.g., City of Johnstown*, 877 F.2d at 1152 (noting that "insurance will not normally cover damages that are, as a result of legal or administrative proceedings, already apparent at the inception of insurance"); *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 63 (3d Cir.1982) (noting that "the purpose of insurance is to protect insureds against unknown risks," and barring coverage under liability policy where "the risk of liability was no longer unknown" at the time the policy became effective); *Bartholomew*, 655 F.2d at 29 ("[A] homeowner could not insure his house against flood damage when the rising waters were already in his front yard." (citation omitted)); *cf. Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co.*, 124 F.3d 508, 518 (3d Cir.1997) (holding that "the known loss doctrine will bar coverage [under a liability policy] only when the legal liability of the insured is a certainty"); *Stonewall*, 73 F.3d at 1215 (rejecting a known loss defense where insured was aware "that its products risked asbestosis and cancer diseases and had received a large number of claims"). We conclude, however, that this defense is un-

available in this case because no reasonable jury could find on the evidence presented to the district court that Stroh or Heileman knew that a recall was inevitable before, but delayed initiating it until after, Heileman products had been added to the Policy.

■ The initial burden of showing that the loss in question was fortuitous—here meaning that the inevitably of such loss was not known to the insured before coverage took effect—is on the insured party. *See In re Balfour MacLaine Int'l, Ltd.*, 85 F.3d 68, 77–78 (2d Cir.1996).[3] Once that burden is met, the insurer must come forward with evidence showing that "an exception to coverage applies," including exceptions based on the non-fortuity or known loss doctrines. *Id.* (internal quotation marks and citation omitted); *see also Ressler v. White*, 968 F.2d 1478, 1479 (2d Cir .1992) (*per curiam*) (holding that insured bore the burden of showing that loss was fortuitous but insurer had the burden to show that allegedly fortuitous cause of loss was a "sham"); *Northwestern Mut. Life Ins. Co. v. Linard*, 498 F.2d 556, 562 (2d Cir.1974) (stating that if insured shows that loss was fortuitous, insurer must establish that the probability that the loss was the result of misconduct or otherwise not fortuitous "is as great as the probability that the loss was fortuitous").

■ Stroh's initial burden is satisfied by evidence showing that it did not take the first steps toward a recall until after

concluded that the Policy language subsumed National Union's fortuity and known loss defenses. Because we assume for purposes of this opinion that that conclusion was in error, we consider the merits of those defenses for the first time on appeal. *Cf. Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 584 (2d Cir.2000) (holding that we may affirm a district court's grant of summary judgment on any basis in the record).

3. *But see Koppers Co.*, 98 F.3d at 1446–47 (predicting that Pennsylvania law would impose the burden of proof as to the fortuity or known loss defense on the insurer); *Stonehenge Eng'g Corp. v. Employers Ins. of Wausau*, 201 F.3d 296, 302 (4th Cir.2000) (same under South Carolina law); *United States Liability Ins. Co. v. Selman*, 70 F.3d 684, 691 (1st Cir.1995) (same under Massachusetts law).

August 12, 1996, some weeks after coverage of Heileman products was added to the Policy. In early August, Stroh learned of several specific consumer complaints of broken glass in bottles filled at the Perry plant, most of which were received by Hornell in July and August 1996. Stroh ceased production at the Perry plant, examined about 30,000 bottles of "Arizona Iced Tea" produced at the plant, convened its "Recall Committee," and consulted with Hornell. Only then, on or after August 20, 1996, was a recall decision made. Had Stroh begun these steps toward a recall prior to the date the Policy was extended to cover Heileman products, there might have been a basis for a reasonable jury to find that Stroh knew then that a recall was inevitable. But these events and the knowledge of inevitability of loss that they might have imparted did not occur until long after coverage of the recall was in place.

Stroh thus having adduced evidence that neither it nor Heileman had knowledge of an inevitable loss, the burden fell on National Union to rebut this evidence and show that the loss was in fact known by either insured to be inevitable. It did not do so.

In support of its assertion that Stroh or Heileman knew the recall was inevitable before July 1, 1996, the date on which coverage of a recall of Heileman products was added to the Policy, National Union relies on two categories of evidence: alleged statements by employees or agents of Stroh and Heileman regarding what the insureds knew in April and May 1996 about problems at the Perry plant, and evidence purporting to show that the insureds were aware before July 1, 1996 of glass inclusion complaints by consumers regarding bottles filled at the plant. Neither category of evidence would permit a reasonable jury to draw the inference urged by National Union.

Included in the first category is an alleged statement by an employee of Stroh's insurance broker to National Union's claims attorney in September 1996, as the dispute over Stroh's claim for the recall was beginning to take shape, that Heileman "had begun to notice glass breakage in March or April of 1996." Similarly, National Union claims that Stroh's quality control inspector said that he noticed the production line flaw at the Perry plant in March or April of 1996, while conducting a due diligence inspection in preparation for Stroh's acquisition of Heileman's assets.

Both employees deny having made the statements attributed to them by National Union. But even if the statements were made, they do not support an inference that Stroh or Heileman knew that a recall was inevitable before July 1, 1996. Neither person is alleged to have indicated that Stroh or Heileman suspected in March or April 1996 that contaminated bottles had reached or would reach the public or to have known that a recall would ultimately be necessary. To the contrary, both are alleged to have indicated that Stroh and Heileman believed that any risk of glass breakage was sufficiently contained by quality controls in place at the Perry plant.

The proof with respect to consumer complaints also fails to support an inference of known inevitability of loss. There is, to be sure, substantial evidence that Heileman, and perhaps Stroh, knew that there had been some consumer complaints regarding broken glass in bottles produced at the Perry plant. But knowledge of such complaints does not, without more, support the inference that Heileman or Stroh knew that a recall was inevitable. Indeed, such an inference is flatly contradicted by the undisputed evidence on the issue: The

plant manager of the Perry plant during the relevant period testified by declaration that "[a] small amount of glass complaints is typical of any bottling facility."

Viewed separately, then, neither the evidence of Stroh's knowledge of a flaw in the Perry production line nor the evidence of its knowledge of consumer complaints support an inference that Stroh or Heileman knew a recall was inevitable. The same is true when this evidence is considered together. There is nothing from which a reasonable jury could properly find that either Stroh, which thought that there were "controls to respond to" the risk of thermal shock breakage in Perry, or Heileman, which similarly believed that despite occasional complaints, "its production process at the Perry plant was safe and free of any contamination in the finished products," knew that that risk had manifested itself in the particular glass inclusions that were giving rise to the consumer complaints. There was thus no factual basis for a finding that Stroh or Heileman knew in March 1996 that a flaw at the Perry plant was sending bottles of iced tea with glass inclusions into the distribution stream. Moreover, even had National Union proffered evidence that Stroh or Heileman knew that there was a connection between the flaw in the Perry process and the complaints, National Union has offered no basis for a jury to infer from such knowledge that Stroh or Heileman knew a recall, rather than some other remedial but uninsured measure, was therefore inevitable.

*4. Loss within the Control of the Insured.* Our conclusion that National Union has failed to adduce facts sufficient to defeat the motion for summary judgment on the known-loss defense is also applicable to National Union's other variation on the fortuity argument: that because Stroh and Heileman deliberately delayed the re-

call until Heileman had been added to the Policy, the Loss was non-fortuitous under New York law because it was not "beyond the control of either party." N.Y. Ins. Law § 1102(a)(2).

National Union relies on several decisions barring coverage for damages caused by intentional acts on the part of insureds. *See Univ. of Cincinnati,* 51 F.3d at 1281–84 (holding that asbestos clean-up costs were non-fortuitous when they were incurred as a result of insured's decision to demolish a building with knowledge that demolition would require asbestos removal); *New York State Elec. & Gas Corp. v. Lexington Ins. Co.,* 204 A.D.2d 226, 226, 612 N.Y.S.2d 43, 43 (1st Dep't 1994) ("[W]here plaintiff deliberately removed [a] ... component from its generating plant for diagnostic testing and preventive maintenance, the resulting downtime cannot be deemed a fortuitous event...."). We have similarly held that damages that "flow directly and immediately from [the insured's] intentional act" cannot be considered "accidental" or fortuitous. *City of Johnstown,* 877 F.2d at 1150.

These decisions would be applicable only if an intentional act by Stroh or Heileman led directly to the accidental contamination. National Union makes no such allegation. Of course, the recall was "intentional" in the sense that it was a purposeful and willful act, and the resulting "Loss" was in that limited sense non-fortuitous. But the "Loss" was nevertheless "fortuitous" in the sense that it resulted from an accidental or unintended event: the glass inclusion problem at the Perry plant. *Cf. Univ. of Cincinnati,* 51 F.3d at 1282 (distinguishing losses caused by deliberate actions taken in reaction to unanticipated conditions from losses stemming solely from voluntary decisions by insured); *A & B Enters., Inc. v. Hartford Ins. Co.,* 198 A.D.2d 389, 390, 604 N.Y.S.2d

166, 168 (2d Dep't 1993) (holding that loss was fortuitous where insured's intentional conduct was contractually required).

National Union also appears to contend, without citation to New York authority, that the *timing* of the Loss at issue was non-fortuitous because Stroh and Heileman postponed the inevitable recall until it was covered by the Policy. But, as we have noted, there is no basis in this record on which a jury could properly conclude that Stroh or Heileman knew the recall was inevitable when the Policy was extended to cover that risk.

 National Union warns that requiring coverage under these circumstances will leave insurers vulnerable to misconduct, offering the hypothetical example of a building owner that adds a building it knows to be structurally unsound to an existing insurance policy and then files a claim for the cost of repairing the building. But the insurer in National Union's example may protect itself by requiring the insured to disclose any problems with buildings added to the policy after the original inception date, just as National Union was free to ask Stroh of any known or potential problems associated with Heileman's assets prior to adding Heileman's assets to Policy coverage. As discussed in more detail below, an insured's failure to respond accurately to such questions may render the policy subject to rescission by the insurer. *See, e.g., Vella v. Equitable Life Assurance Soc'y*, 887 F.2d 388, 391, 393 (2d Cir.1989). And even in the absence of such inquiry, coverage may be barred where the insured fraudulently withholds a material fact.

*See, e.g., Lighton v. Madison–Onondaga Mut. Fire Ins. Co.*, 106 A.D.2d 892, 892–93, 483 N.Y.S.2d 515, 516 (4th Dep't 1984). In the case before us, the insurer has explicitly disclaimed any intent "to prove or rely upon a theory of fraud." *See National Union I*, 1999 WL 619635, at *2, 1999 U.S. Dist. LEXIS 12580, at *6.

### III. Due Diligence

Count II of the amended complaint alleges that Stroh and Heileman breached Condition O, the Policy's due diligence clause.[4] Condition O reads:

> DUE DILIGENCE: The Insured will exercise due diligence to do all things reasonable and practical to avoid any happening or circumstance covered by this policy and to make all reasonable efforts to mitigate any Loss arising as a result of an Insured Event.

 National Union offers several interpretations of this provision and the manner of its breach, none of which we find persuasive. First, it argues that Stroh and Heileman breached Condition O by failing to "discover[ ] (and advis[e] underwriters)" of the contamination problem at the Perry plant. There is no factual support for the assertion that the defendants failed to *"discover"* the problem. Indeed, National Union vigorously argues in connection with other claims that Stroh and Heileman successfully "discovered" the problem before July 1, 1996. Furthermore, there is no evidentiary basis for a claim that had Stroh or Heileman learned of the contamination at the earliest possible time, they could have mitigated or

---

4. Stroh moved for summary judgment on this claim on the ground that Heileman had waived Condition O as a basis for avoiding coverage by failing to mention it in its letter declining coverage. The district court found, however, that the declination letter expressly mentioned Condition O and denied summary judgment. *See National Union II*, 1999 WL 1267461, at *4–*5, 1999 U.S. Dist. LEXIS 19801, at *12–*13. Stroh reasserts its waiver argument on appeal, but we need not reach that issue because we affirm on the merits the district court's ruling in Stroh's favor.

avoided the "Loss" through an exercise of due diligence.

■ We also do not understand how a failure to "advise underwriters" of the problem amounts to a lack of due diligence as defined by Condition O. That provision addresses the need to avoid "any happening or circumstance covered by this policy"; it says nothing about disclosure of the risk of such covered events. Moreover, because the Policy explicitly addresses the insureds' duty to disclose material facts in Condition W, discussed below, National Union's proposed interpretation of Condition O would render that more specific requirement surplusage.

■ National Union also contends that the defendants breached the due diligence clause by delaying the recall until Heileman was covered under the Policy. In addition to lacking a sufficient factual basis, this argument is premised on a misinterpretation of the Policy. Condition O requires Stroh to exercise due diligence in order to avoid a covered "happening or circumstance," not to avoid having it happen during the policy period.

National Union further undercuts its own argument by asserting, persuasively, that the happening or circumstance to be avoided under Condition O is "an accidental contamination." Under this definition, the recall was not a "happening or circumstance" within the meaning of Condition O, and Stroh's alleged failure to initiate the recall before it fell within the Policy's coverage, even if proven, could not be considered a lack of due diligence.

## IV. Duty to Cooperate

Count III of the amended complaint alleges that Stroh breached Conditions Q and R of the Policy by failing to provide National Union with financial information it requested in the course of its investigation of the disputed claim. Condition Q requires Stroh to cooperate with National Union "in all matters relating to this insurance." Condition R gives National Union the right to "examine and audit the Insured's business documents relating to the subject matter of this insurance."

The district court concluded (1) that National Union failed to raise a triable issue as to whether Stroh in fact breached these provisions; and (2) that National Union forfeited this defense to coverage by failing to cite it in its denial of the claim. *See National Union II,* 1999 WL 1267461, at *6–*7, 1999 U.S. Dist. LEXIS 19801, at *13–*17. We agree with the former conclusion and therefore need not reach the latter.

■ National Union first requested the financial information on November 21, 1997, more than fifteen months after it was notified of Stroh's claim. In response, on November 25, 1997, Stroh requested that National Union "take a position on coverage"[5] before requiring Stroh to undertake a "time consuming and costly accounting exercise," noting that National Union had already conducted a fifteen-month investigation of the claim that included the review of "hundreds of documents and numerous personal interviews." On December 16, 1997, National Union acknowledged that "coverage is still at issue," but stated that the purpose of the accountant's investigation "is to expedite

---

5. The bulk of National Union's argument on appeal is that it was entitled to the financial information at issue before conceding liability. We need not determine the parameters of National Union's right to the information, because we conclude that Stroh's failure to supply it under the circumstances of this case did not amount to a breach of its duty to cooperate.

the adjustment process *should coverage be accepted*" (emphasis added) and again requested access to financial information. It is undisputed that Stroh's duty to cooperate ended on February 24, 1998, when National Union officially disclaimed coverage.

The district court correctly concluded that Stroh did not breach the cooperation clause. National Union alleges only that Stroh refused to compile and divulge information that was needed in the event that National Union accepted coverage. It did not accept coverage. Therefore, whether or not National Union had some abstract right to the information, it cannot complain that it was in any way prejudiced by Stroh's failure to provide it. *Cf. Thrasher v. United States Liab. Ins. Co.*, 19 N.Y.2d 159, 168, 225 N.E.2d 503, 508, 278 N.Y.S.2d 793, 800 (1967) (holding that in the context of an automobile liability insurance, an assertion of the failure of an insured to cooperate cannot succeed unless "the attitude of the insured, after his cooperation was sought, was one of willful and avowed obstruction") (citations and internal quotation marks omitted).

## V. Failure to Disclose

Count IV of the amended complaint alleges that Stroh violated Condition W of the Policy by failing to disclose to National Union material information regarding the risk of contamination at the Perry plant. Condition W states:

This policy is null and void in case of concealment, misrepresentation, non-disclosure, or fraud by any Insured of a material fact concerning:

1. this insurance or the procurement thereof; or

2. the Insured's Product(s), or the Insured's interest in the Insured's Product(s); or

3. any Insured Event, or any Loss or claim under this policy.

■ "Under New York law, 'nondisclosure of a fact concerning which the applicant has not been asked does not ordinarily void an insurance policy absent an intent to defraud.'" *First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 117 (2d Cir.1999) (quoting *H.B. Singer, Inc. v. Mission Nat'l Ins. Co.*, 223 A.D.2d 372, 372, 636 N.Y.S.2d 316, 316 (1st Dep't 1996)); *see also Sebring v. Fidelity–Phenix Fire Ins. Co.*, 255 N.Y. 382, 387, 174 N.E. 761, 762–63 (1931) ("Unless nondisclosure of a fact, concerning which he has not been asked, be fraudulent, the applicant's omission to state it will not avoid a fire or life policy.").

■ As we have noted repeatedly, National Union has specifically disclaimed any allegation that Stroh engaged in fraud. *National Union I*, 1999 WL 619635, at *2, 1999 U.S. Dist. LEXIS 12580, at *6. And it is undisputed that before agreeing to extend coverage to Heileman, National Union did not ask either defendant about known instances of contamination or the risk of a recall—or indeed about any risks—in relation to Heileman's assets. Stroh thus did not breach its duty of nondisclosure as that term is defined under New York law. *Cf. Atlantic Mut. Ins. Co. v. Balfour MacLaine Int'l Ltd.*, 85 F.3d 68, 82 (2d Cir.1996) (holding that policy could not be voided where insured "disclosed everything it was asked to by [the insurer] during its application process, and ... there was no evidence of a willful intent on [the insured's] part to defraud [the insurer]").

National Union contends that non-disclosure may render an insurance policy void even in the absence of fraudulent intent on the part of the insured or a specific inquiry by the insurer. But all of the decisions on which it relies involved either incomplete

or misleading answers to specific questions from the insurer, *see Vella,* 887 F.2d at 391, 393; *Wageman v. Metropolitan Life Ins. Co.,* 24 A.D.2d 67, 263 N.Y.S.2d 915 (1st Dep't 1965), *aff'd,* 18 N.Y.2d 777, 221 N.E.2d 566, 274 N.Y.S.2d 908 (1966); *Schondorf v. SMA Life Assurance Co.,* 745 F.Supp. 866, 871 (E.D.N.Y.1990), or fraudulent concealment by the insured, *see Lighton,* 106 A.D.2d at 892–93, 483 N.Y.S.2d at 516.

On the May 1, 1996 renewal application that led to the extension of the Policy in Endorsement No. 4, National Union did ask whether Stroh knew of "any actual or suspected accidental contaminations involving any of [Stroh's] products during the last twenty-four ... months," and Stroh denied any such knowledge. But Stroh's statements were indisputably truthful when made. Stroh was then seeking extension of insurance coverage for costs associated with contamination of Stroh's products. Not until later that month did Stroh's broker contact National Union to ask about the possibility of adding to the Policy coverage with respect to contamination of Heileman products, and not until May 21 did National Union make a proposal to add Heileman to the Policy. National Union did not then or thereafter ask Stroh about contamination involving Heileman products.

National Union argues, however, that the renewal application put Stroh on notice that it considered information about known or potential contaminations to be material, and asserts that New York law requires an applicant for insurance to disclose facts it knows to be material even in the absence of specific inquiry. Therefore, National Union asserts, when Stroh sought to extend the Policy's coverage to Heileman products, it was required to disclose what it knew about actual or potential Heileman contamination.

■ National Union first raised this argument in connection with its motion for reconsideration under Rule 6.3 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York. The district court thus rejected the argument as untimely. *See National Union III,* 2000 WL 264320, at *9, 2000 U.S. Dist. LEXIS 2581, at *24–*25. National Union does not expressly challenge this ruling, and we see no reason to question it. *See Caribbean Trading & Fidelity Corp. v. Nigerian Nat'l Petroleum Corp.,* 948 F.2d 111, 115 (2d Cir.1991) (holding that predecessor to Rule 6.3 "preclud[es] arguments raised for the first time on a motion for reconsideration"), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992); *Polsby v. St. Martin's Press,* No. 97 Civ. 690(MBM), 2000 U.S. Dist. LEXIS 596, at *2, 2000 WL 98057, at *1 (S.D.N.Y. Jan.18, 2000) ("On such a [Local Rule 6.3] motion, a party may not advance new facts, issues, or arguments not previously presented to the Court." (internal quotation marks omitted)).

The district court ruled in the alternative that National Union's argument failed on the merits. Although we are inclined to agree,[6] we need not reach this issue

---

**6.** The decisions cited by National Union in support of its argument hold only that an insured's failure to disclose information it knows to be material will void the policy if it amounts to fraud or a failure to answer specific inquiries from the insurer. *See Sebring,* 255 N.Y. at 387, 174 N.E. at 762–63; *Aetna Casualty & Surety Co. v. Retail Local 906,* 921 F.Supp. 122, 132 (E.D.N.Y.1996), *aff'd,* 106 F.3d 34 (2d Cir.1997); *Lighton,* 106 A.D.2d at 892–93, 483 N.Y.S.2d at 516; *see also DiDonna v. State Farm Mutual Automobile Ins. Co.,* 259 A.D.2d 727, 687 N.Y.S.2d 175, 176 (2d Dep't 1999) ("Even assuming materiality, nondisclosure of a fact concerning which the applicant has not been asked does not ordinarily void an insurance policy absent an in-

which, since it was not properly raised in the district court, is not properly before us.

## VI. Number of Deductibles

Count VI of the amended complaint seeks a declaration that Stroh's claim for the recall of bottles filled at the Perry plant is subject to more than one deductible.

The "declarations" accompanying the original Policy provide for a $250,000 deductible for "each Accidental Contamination." The Policy itself, however, states in Declaration C of the General Conditions that the "deductible(s) stated in Item IV of the declarations will apply separately to each and every Loss." As noted, a "Loss" includes certain costs "incurred by the Insured directly and solely as the result of a covered Insured Event," including "Recall Costs incurred . . . as a result of an Accidental Contamination." And an "Accidental Contamination" is "any accidental or unintentional contamination . . . of an Insured's Product(s) which occurs during or as a result of its production, preparation, manufacture or packaging."

National Union originally contended that a separate deductible would apply to each contaminated bottle, a reading that would effectively have wiped out all insurance coverage. It subsequently modified its position to argue that a separate deductible applies to each "proximate, uninterrupted, and continuous cause" of contamination, a position with which the district court generally agreed. *See National Union III*, 2000 WL 264320, at *3, 2000 U.S. Dist. LEXIS 2581, at *8. Stroh argued to the district court, as it does on appeal, that that means that the Policy provides for one deductible per recall.

The district court concluded that a separate deductible applied to each "Loss," with "Loss" defined not as the full cost of a given recall but as the recall costs attributable to a specific "Accidental Contamination." *See id.*, 2000 WL 264320, at *3, 2000 U.S. Dist. LEXIS 2581, at *7–*8. Because a single recall may be required to address more than one "Accidental Contamination," the cost of a recall may constitute more than one "Loss" and thus be subject to more than one deductible. The district court apparently viewed an "Accidental Contamination" not as a single contaminated bottle, but as "a single proximate, uninterrupted, and continuous cause" of damages to Stroh. *Id.*, 2000 WL 264320, at *3, 2000 U.S. Dist. LEXIS 2581, at *8 (internal quotation marks omitted). It held that "[w]here there are several such causes, several deductibles apply." *Id.*

In applying this standard, the district court decided that the "uncontested record" demonstrates that all of the instances of glass inclusion that led to the recall were attributable to a single cause: the production line flaw. *Id.* 2000 WL 264320, at *5, 2000 U.S. Dist. LEXIS 2581, at *13–*14. The court noted that, for example, National Union's claims investigator stated in an affidavit that "the cause of the contamination" was a "thermal shock problem[ ]" caused by the production line flaw. The court also noted that the summaries of consumer complaints submitted by National Union show a steady flow of complaints in the months leading up to the recall, with no discernable gaps or spikes that could indicate the existence of varying intervening causes of contamination.

██ On appeal, National Union does not contest the district court's interpretation of the relevant provisions of the Poli-

tent to defraud." (quoting *H.B. Singer, Inc.*, 223 A.D.2d 372, 636 N.Y.S.2d 316)).

cy. It also concedes that "the record thus far does point to a flaw in the production line as the root cause of the problem." National Union points to nothing in the record overlooked or misinterpreted by the district court that indicates more than one "proximate, uninterrupted, and continuous cause," to use its own definition, of contamination.

National Union's remaining argument is that the district court improperly denied its request pursuant to Fed. R.Civ.P. 56(f) for additional discovery on the cause or causes of glass contaminations at the Perry plant. A party seeking additional discovery under Fed.R.Civ.P. 56(f) to justify its opposition to a summary judgment motion must submit an affidavit explaining, among other things, "what facts are sought and how they are to be obtained; ... what efforts the affiant has made to obtain those facts; and ... why those efforts were unsuccessful." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir.1985). Even where a Rule 56(f) motion is properly supported, a district court may refuse to allow additional discovery "if it deems the request to be based on speculation as to what potentially could be discovered." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir.1994). We review a district court's refusal to allow additional discovery for abuse of discretion. *See Burlington Coat Factory Warehouse Corp.*, 769 F.2d at 925.

Before initiating this litigation, National Union conducted a seventeen-month investigation that included interviews with key Stroh personnel and a visit to the Perry plant. This was followed by eleven months of formal document discovery preceding Stroh's motion for summary judgment. Only depositions under Fed. R.Civ.P. 30 remained. National Union nonetheless failed to produce any evidence that the glass inclusion problem at the Perry plant was attributable to anything other than the single production line flaw. Nor did National Union submit the requisite affidavit describing the nature of the uncompleted discovery that it sought.[7] Instead, it asserted in its opposition papers, as it does on appeal, that it should have been given the opportunity to explore the possibility that variations in individual production runs at the Perry plant may have exacerbated the risk of contamination created by the production line flaw. The district court declined to grant time for additional discovery solely on the basis of "[s]uch speculation at this late date." *National Union III*, 2000 WL 264320, at *7, 2000 U.S. Dist. LEXIS 2581, at *17. Under these circumstances, the district court acted within its discretion in refusing to allow additional discovery solely on the basis of such speculation. *See Paddington Partners*, 34 F.3d at 1138.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

---

7. National Union did submit an affirmation in support of its Rule 56(f) motion. But the district court apparently did not consider this a proper Rule 56(f) affidavit, perhaps because it fails to identify the discovery it seeks or explain with any specificity how such discovery may justify its opposition to summary judgment. *National Union III*, 2000 WL 264320, at *7, 2000 U.S. Dist. LEXIS 2581, at *16. National Union makes no mention of its affirmation on appeal.